MOSCOW FIRE INSURANCE COMPANY OF MOSCOW, RUSSIA, and PAUL LUCKE, as Sole Surviving Director of Moscow Fire Insurance Company of Moscow, Russia, and Conservator of Its Property, Plaintiffs, *v.* BANK OF NEW YORK AND TRUST COMPANY, as Agent or Depositary of Said Moscow Fire Insurance Company of Moscow, Russia, and of Said Paul Lucke, as Surviving Director and Conservator, and Others, Defendants.*

SAMUEL E. MORRO (MORROW) and Others, in Behalf of Themselves and All Other Stockholders of Moscow Fire Insurance Company of Moscow, Russia, Plaintiffs, *v.* MOSCOW FIRE INSURANCE COMPANY OF MOSCOW, RUSSIA, PAUL LUCKE and BANK OF NEW YORK AND TRUST COMPANY, as Agent and Depositary of Said Moscow Fire Insurance Company of Moscow, Russia, and of Said Paul Lucke, Defendants.*

UNITED STATES OF AMERICA, Intervenor.

Supreme Court, New York County, January 19, 1937.

* See, also, 249 App. Div. 404.

*Lamar Hardy, United States Attorney for the Southern District of New York [Edward J. Ennis and Henry Monroe of counsel], for the United States of America, intervenor; David E. Hudson, Special Assistant to Attorney-General.*

*Campbell & Whipp [Frederick B. Campbell and Paul C. Whipp of counsel], for the plaintiffs Moscow Fire Insurance Company of Moscow, Russia, and Paul Lucke, etc.*

*Borris M. Komar, for the plaintiffs Morro (Morrow) and others.*

*Samson Selig; Chester W. Davis; Alfred L. Green; Englehard, Pollak, Pitcher, Stern & Clarke [Frank G. Dougherty and George J. Hadjinoff of counsel]; Cabell, Ignatius & Lown [Joseph S. Catalano of counsel]; and Osmond K. Fraenkel, for certain creditors and shareholders of Moscow Fire Insurance Company.*

*White & Case, for claimants.*

*Henry Breckinridge, for claimants.*

*Emmet, Marvin & Martin [Elizabeth M. Graham of counsel], for the Bank of New York and Trust Company.*

DONNELLY (JAMES F.), Referee. By determination of the Court of Appeals made at the end of the domestic liquidation of five Russian insurance companies whose surpluses could not be remitted to domiciliary receivers in Russia because of non-recognition of that country in 1931, the surplus of each " that. might otherwise be

lost " was directed to be turned over to " directors," to a " Conservator," to a " depositary," or as the emergencies of each particular company differently required, upon the proviso that the funds " would not be withdrawn except upon an order of a court of competent jurisdiction." (See *Matter of People* [*Russian Reinsurance Co.*], 255 N. Y. 415 *et seq.*)

Thereafter judgment in the liquidation proceeding affecting the Moscow Fire Insurance Company was entered upon the remittitur of the Court of Appeals on August 11, 1931. It provided (*Matter of People* [*Moscow Fire Insurance Co.*], 255 N. Y. 432, 435) that the Superintendent of Insurance should deliver the surplus assets pursuant to the decision. Moscow Fire Insurance Company and Paul Lucke, its sole surviving director who became its " Conservator " having given the required stipulation provided in the direction of the Court of Appeals, the assets of this company, approximately $1,000,000 in cash and securities, were turned over to the defendant Bank of New York and Trust Company on April 18, 1933.

Moscow Fire Insurance Company and Paul Lucke immediately brought this suit on April 19, 1933, to determine that these remaining assets were payable to creditors and shareholders. A second suit was brought in June, 1933, by one Morro, a shareholder of Moscow Fire Insurance Company. In October, 1933, the former suit was referred to me as referee to hear and determine the issues therein. Later, the Morro suit and the Lucke suit were consolidated and were brought on for trial before me as such referee.

At the end of that reference on August 13, 1934, the United States attorney presented to the referee a proof of claim of the United States to the entire fund, based upon the Litvinov assignment of November 16, 1933, made by the Russian government at the time when recognition was accorded by the United States to that government. The referee agreed to withhold his report until August 21, 1934, the United States attorney advising that meanwhile he would determine whether to press the claim of the United States by intervention herein or by independent suit in the Federal court.

Judgment was subsequently entered by me directing the payment of the claims of creditors as allowed by me and after making a reserve for future claims and expenses, the residue was directed to be distributed as liquidating dividends to shareholders of Moscow Fire Insurance Company. Provision was made that any shareholder or party to the action or successor in interest might apply at the foot of the judgment for further directions.

The United States government, instead of intervening at that time in these actions, brought a suit in the United States District Court for the Southern District of New York for an accounting against Bank of New York and Trust Company of the funds in the possession of that depositary. The basis of that suit was that in 1917 or 1918 the company had been dissolved, that its property had been confiscated and appropriated by decrees of the Russian government and that on November 16, 1933, whatever claim the Russian government had was assigned to the United States in connection with the recognition of the Soviet Union.

The Bank of New York and Trust Company moved to dismiss the complaint for insufficiency and the United States of America moved for an interlocutory injunction restraining any distribution under the order and prior judgments in the State courts. The District Court denied the motions for injunction and dismissed the complaint on the ground that the Russian decrees, by reason of their confiscatory character, were ineffective to vest in the Russian government title to the fund situated in New York, and that the funds were not covered by the assignment to the United States (10 Fed. Supp. 269). Appeal was thereupon taken by the United States to the Circuit Court of Appeals, which affirmed the judgment (77 F. [2d] 866, 880, 881). The United States appealed to the United States Supreme Court, which also affirmed the judgment (296 U. S. 463).

In the Circuit Court of Appeals and in the United States Supreme Court the decision was solely upon the jurisdictional point that the Federal court should not interfere with the administration of the funds already under control of New York courts in these *quasi in rem* actions. Accordingly, under principles of comity governing the convenient and orderly administration of justice in the Federal and State courts, the United States was remitted to intervene in these actions and prosecute its claim in the forum where the funds were held and where prior jurisdiction was had (296 U. S. 463, 478, 480).

On April 13, 1936, the Supreme Court of this State allowed the United States of America, without prejudice to the contentions of the parties to said actions, to intervene herein, be-made a party and to file its petition. The order entered restrained the bank from paying out any moneys excepting certain payments which had been theretofore made and moneys thereby directed to be paid. The issues raised by the petition were again referred to me to hear and determine the new issues presented.

In its filed petition the United States of America alleges the creation of the Moscow Fire Insurance Company as a Russian

corporation; that prior to 1918 the insurance company had certain cash, securities and other assets in this State deposited pursuant to law with the Superintendent of Insurance and for the transaction of its business. The petition further alleges the enactment of Soviet decrees of April 18, 1918, affecting the registration of securities; of November 28, 1918, relating to the organization of the insurance business; of March 4, 1919, on the liquidation of obligations of State enterprises; of November 18, 1919, annulling life insurance contracts, by which the business of insurance was proclaimed to be a monopoly of the Russian State; that thereby all Russian insurance companies and their property and assets of every kind and wherever situated were nationalized and all their debts were canceled and extinguished; and that thereby all shares and rights of shareholders in and to the property and assets of Russian insurance companies, including Moscow Fire Insurance Company, were likewise discharged, canceled and extinguished. The petition then asserts that the Moscow Fire Insurance Company was dissolved and its property, including the assets, in this State were nationalized and became the property of the Soviet government and its debts and its obligations to creditors and shareholders were canceled and discharged. The petition also alleges the appointment of the Superintendent of Insurance as liquidator of the United States branch of the Moscow Fire Insurance Company by order of the Supreme Court of the State of New York dated August 8, 1925, resettled September 11, 1925, and that pursuant to these orders the Superintendent of Insurance took possession of all assets of the United States branch, satisfied the claims of its domestic creditors and retained this surplus fund in its possession, which surplus fund, amounting to $1,080,399.54, was by order dated August 8, 1931, paid over to defendant Bank of New York and Trust Company.

The United States thereupon asserts by its petition that it is the sole and exclusive owner of the said surplus funds by virtue of an executive agreement dated November 16, 1933, under which the Union of Soviet Socialist Republics assigned to the United States of America all amounts admitted to be due or that may be found to be due to the said union, including the said surplus funds. Accordingly it asks that the judgment of this court in these actions dated August 22, 1934, and all prior judgments be vacated and adjudged of no effect upon the rights or title of the intervenor.

The aforementioned assignment upon which the United States relies is constituted by an exchange of diplomatic letters passing between President Roosevelt and Maxim M. Litvinov, Commissar of Foreign Affairs of the Union of Soviet Socialistic Republics.

It is urged by creditors and shareholders of the Moscow that the language of Mr. Litvinov's letter is not sufficiently broad to cover and should be construed not to cover the surplus deposits which are the subject of these actions. It is insisted that it only assigns claims owed by American nationals directly to either the U. S. S. R. or its predecessor governments, the Kerensky and Imperial regimes, and that it does not cover or include claims obtained through confiscation of the property of Russian nationals.

However, the broad language of the assignment, to wit: " Amounts admitted to be due or that may be found to be due ' the Soviet Government ' as the successor of prior governments, *or otherwise*, from American nationals," would seem to be all inclusive. This is the view taken of it by other courts. (*State of Russia* v. *National City Bank*, 69 F. [2d] 44, 48; *United States* v. *Belmont*, 85 id. 542.)

Moreover, since the order of intervention, the intervenor, during the trial, has procured from the Soviet Ambassador Plenipotentiary to the United States an additional note dated July, 1936, by which the assignor U. S. S. R. sufficiently enlarges the scope of the Litvinov note of November 16, 1933, if it were otherwise defective.

The intervenor also relies upon inter-departmental communications annexed to its petition to explain and characterize its title, one dated September 17, 1934, from Attorney-General Cummings to Secretary of State Hull, the other a reply by the Secretary of State to the Attorney-General, and a third letter dated October 27, 1934, from the acting Secretary of State to the Attorney-General. These must be considered as self-serving and ineffective statements by an assignee. The effect of these documents is an assertion by the recipient of the alleged title that it was the purpose of the assignment to assign to the United States not merely all amounts to which the Soviet government was entitled as successor to the former governments in Russia, but also all amounts to which the Soviet government, that is, the U. S. S. R., considered that it was entitled to in any manner.

The intervenor contends that the document received in the course of the trial before me by the Department of State from the Ambassador to United States representing the U. S. S. R., dated July, 1936, amplifies and explains its title and the consideration behind the assignment. Since this last document is in the nature of an instrument to cure title and is not a mere declaration by an assignee but a binding statement by the assignor, it must be considered as competent proof to support the title of United States of America, and to establish the consideration running to the United States in the transaction.

This last document informs us " that the 1933 agreement has in view those rights of the government of the Union of Soviet Socialist Republics which are subject to realization on the territory of the United States and which have passed to the Government of the Union of Soviet Socialist Republics by virtue of its succession to former governments of Russia or by virtue of its succession to private companies on the basis of legislation concerning nationalization."

Referring to the original assignment or exchange of communications between the President of the United States and Maxim M. Litvinov and the words therein assigning " the amounts admitted to be due or that may be found to be due it as the successor of prior governments of Russia, *or otherwise* from American nationals," this new document, dated July, 1936, states that " these words define these amounts as amounts passing to the government of the Union of Soviet Socialist Republics by virtue of succession to prior governments of Russia or succession otherwise, for instance, to pre-revolutionary organizations and companies which were nationalized in accordance with Soviet legislation."

It seems clear, therefore, that the intent to be gleaned from all the assignor's correspondence is that it assigns whatever claim the Union of Soviet Socialist Republics (U. S. S. R.) had in the surplus of the Moscow Fire Insurance Company to the United States of America.

But the plaintiffs in these actions assert that any assignment is ineffective because there was no seizure of the fund, no reduction to possession. *Frenkel & Co., Inc.*, v. *L' Urbaine Fire Insurance Co.* (251 N. Y. 243) and *Ware* v. *Hylton* (3 Dall. 199, 226) are depended upon to support this proposition. In the *Frenkel* case and in the *Ware* case the statutes involved were both passed in the exercise of a war power, the one declaring contracts between German and French citizens null and void, the effect of which was to suspend performance during the existence of the war, and the other involving a statutory confiscation of private debts due to the British enemy, which debts were sequestered and paid under statute to the State of Virginia. Upon peace being made, the debts not paid would revive and the rights of creditors also revived. Necessarily, the essential factor was seizure, and since the basis of the rule was to cripple the enemy during the war period, that principle can have no application to the situation here. In the *Frenkel* case a seizure was suggested as necessary because, while the moneys were earned during a peace period, the power to take, if claimed at all, was through the war power under which there would be a reviver of rights after the war terminated.

In the situation at bar the transactions and acts related to a peace period in which the prevailing system of government in Russia was destroyed and a new government based upon State ownership of all property was created. A new national economy inconsistent with private ownership was born. This new government took over insurance as a State monopoly, destroyed the Moscow Insurance Corporation under the powers of a creator to destroy the corporate creature and confiscated the assets of this corporation in Russia. The decrees to accomplish this result were passed pursuant to legislative power and made effective under the power of eminent domain. The exercise of the power of eminent domain was the use of a peace power, in this case confiscatory, though customarily it would have been compensatory.

In these circumstances the need of seizure or manucapture was not essential to the taking of the property. The meaning of the word " confiscate " " is to transfer property from private to public use or to forfeit property  *  *  *  to the State." (*Ware Case, supra*, p. 234.) Under international law, in the situations depicted in the *Ware* and *Frenkel* cases, seizure during hostilities was necessary in order to prevent a reviver of rights which ensued when peace was made. In a period of peace a seizure is not essential in order that forfeiture shall result under an exercised power of confiscation. Seizure may be important in peace times when property is taken by an illegal act; but here, the act of Russia in passing the decree was legal. Here, also, the property was forfeited in Russia since its further retention was inconsistent with, and in contradiction of, the new concept of government, and from the Russian standpoint, entirely proper.

Sovereignty means that the decree of the sovereign makes law, and foreign courts cannot condemn the influences persuading the sovereign to make the decree. (*American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347.)

Indeed the new concept could not exist if private ownership of business and properties which were nationalized continued.

I, therefore, hold that seizure by the Russian government was not a condition which must have first existed before the Russian government could own the claim and, therefore, make a valid assignment or recovery if there was nothing otherwise in the case which would prevent such recovery.

The further contention is made at this juncture against the intervenor's title that the Union of Soviet Socialist Republics had no interest to assign since the confiscation was by a State of that Union, the R. S. F. S. R. The " U. S. S. R." occupies in the Russian governmental scheme the same position which the United States

of America occupies toward the forty-eight States of our Union. In the Union of Soviet Socialist Republics there are approximately seven States; one of these is the Russian Socialist Federated Soviet Republic. The Union of Soviet Socialist Republics was not formed until December 30, 1923. It was formed by several independent States which conceded certain powers and property to the Soviet Union. The Union of Soviet Socialist Republics, therefore, did not exist on November 28, 1918, when the confiscatory decree affecting the insurance business of the Russian Republic was passed. This decree of November 28, 1918, is not the decree of the U. S. S. R. but a decree of the Workers' and Peasants' Government of the Russian Socialist Federated Soviet Republic and enacted by it. It is claimed, therefore, that unless the confiscating State, the R. S. F. S. R., in some way conferred title upon the U. S. S. R. the assignment upon which the government relies would be inoperative to cover the funds of the Moscow Fire Insurance Company said to have been confiscated abroad and here by the decree of November 28, 1918.

It stands conceded that there was no direct assignment from R. S. F. S. R. to the Union. Even the usual way of passing a law to the effect that certain property or rights belonging to R. S. F. S. R. were to become the property of the Union was not resorted to in this case. It is claimed on the other side that the R. S. F. S. R. was a Federal State, asserting power over all of Russia, though its own confines were limited to territory around Moscow and Petrograd, and that the U. S. S. R. succeeded to this Federal power and Federal statehood and, therefore, succeeded to the property of R. S. F. S. R. But R. S. F. S. R. still continues as a State and continues to hold its own property and indeed may exercise the power of dealing with foreign countries at least to the extent of borrowing funds outside for its own internal needs. There is little support in the record to sustain such a claim and indeed it seems evident that U. S. S. R. did not succeed to the property of R. S. F. S. R. when the new Union was formed in 1923, even if it followed it as the Federal State of Russia.

As an alternative claim, however, the intervenor contends the U. S. S. R. had power pursuant to the broad provisions of the Constitution of the Union to appropriate any property of any State in the Union and that by the assignment made by Mr. Litvinov in behalf of the Union there was an appropriation from R. S. F. S. R. by the Union of whatever rights the Union had to the Moscow surplus. The provisions of the Constitution are not very clear upon this subject but are perhaps sufficiently general to justify

such a finding, especially in view of the exercise of an authority to assign by the Plenipotentiary of the Union thereby placing such a practical construction upon the Constitution of the Union. These powers are to be found in the Constitution of the Union which confers broad financial and budgetary powers upon the Union over constituent States and by which it is granted power to make property concessions and to exercise a centralized control of the entire national economy in governing the Union.

I am called upon here not merely to construe statutes or decrees but to construe a foreign Constitution of a union of States in relation to a Constitution of one of the constituent republics thereof. These Constitutions must be looked upon as instruments permanent in nature which do not state or provide details of government, but which state merely general principles. The Constitution of the Union must be looked upon as one which deals with a broad framework of the law of that nation and its permanent system of government. It must be recognized that the framers of a Constitution cannot anticipate conditions which arise in the growth of a nation and cannot establish at the time of its adoption all the law which may, as the necessities of time exact, be required to meet changing conditions of a new nation. This is especially true here because there was established not merely a new nation but a new experiment in government. Set forth in this new compact was a new principle of State ownership of all property within the area of its confines. Such a Constitution cannot and did not here deal in details. It enunciated and declared general principles and provided only general means to accomplish these broad objectives. Necessarily the language which is used must be applied to all new situations as they come into being in order that they may be brought within the general declared principles and purposes of such a union of States. No nation can provide immutable rules or all the machinery for that, which, if foreseen at all, is only seen dimly, and the written word must be taken as intended to cover and effect the general principles which state the objectives established in the framework of the new social compact. In construing such a Constitution, the Constitutions of the constitutent States and the laws and decrees of the constitutent States must necessarily be inferior to the Constitution of the Union, and where repugnant to the purpose of the Federal Constitution, which is the supreme law of Russia, must yield under ordinary principles of constitutional construction to its provisions and purposes.

A Constitution is not intended to be a limitation on the development of a country nor an obstruction to its progress and foreign relations. Courts are not inclined to adopt technical or strained

constructions which would unduly impair the efficiency of its legislative and political powers. A Constitution is intended to meet and to be applied to new conditions and circumstances as they may arise in the progress and development of the community. A court should look to the history of the times and examine the origin and development of the new nation and the state of facts existing when the Constitution was framed and adopted and the prior history of the constitutent republics in order to give significance to the new system of government which it creates.

The Constitution of the U. S. S. R. must be interpreted in the light of the character of this new system and the social purposes intended by this new and heretofore unused social compact. The safest way to ascertain the scope of the principles and purposes of the new Communistic system created is to see what is done under it, even if it is only done for the first time, in order to arrive at its true construction. What the Plenipotentiary of Russia, Mr. Litvinov, has done here is no doubt in Russia more likely a political, rather than a judicial question under its system, and this is especially true because the system there is not one of separated executive and legislative powers but a system in which legislative and executive powers are combined in the various organs of government. In order to determine that same question in this tribunal, namely, what the foreign laws are, there necessarily arises a judicial question. In deciding that question we must recognize its status abroad. We must also recognize that its status here from the standpoint of what has been done by our executive with foreign diplomats, in an understanding akin to a treaty is purely a political question here. Since the acts performed must be taken as having been done in the highest good faith, under an exercise of powers asserted to exist by the very act, in construing the constitutional language and the powers created, we must consider the construction which the nation itself through its diplomats and agents has placed upon its own Constitution. It is difficult for us, in attempting to resolve a question of fact upon this subject, to disregard the persuasive influence of the act itself. Indeed, the mere exercise of this power has a compelling significance. This becomes especially important because in a construction of a Constitution all ordinary rules of construction should yield to a liberal interpretation; and the purposes intended by the constitutional provisions may not be evaded. Purposes and objectives of a constitutional provision may not be overridden by a construction which would defeat the fundamental aim and object of this Constitution and the purposes behind it and ignore the principles of State ownership and State control of property and the use thereof by the State which underlie it. It

is contended that because there is an express conferring of certain powers upon the Federal government of Russia, the U. S. S. R., by its Constitution, to grant concessions, that this expression of a grant of power excludes the other powers claimed here to exist in the Federal Union. The maxim *expressio unius est exclusio alterius* can have little place in an interpretation of a Constitution. While it may be a proper and useful rule it cannot be used to exclude the fair implications of other broad language and broad powers covering different subjects which are also expressly to be found therein. The power to grant oil or mineral concessions cannot exclude the power here claimed, a power to assign property belonging to a State which arises under the budgetary and financial powers of the Union of Soviets and its centralized control of the entire national economy and also its power over concessions. Even if the language of this Constitution were not explicit or admitted of doubt, it is certainly to be presumed that it was intended to be in accord with the acknowledged and declared principles of a new constitutional ideology, not of private property, not of a liberty in ownership, but a denial of these rights and a vesting of supreme power and a supreme dominant ownership in the Union created.

I, therefore, find that whatever right the R. S. F. S. R. possessed in and to the surplus of the Moscow Fire Insurance Company the U. S. S. R. had the right to assign and did assign, but I am nevertheless of the opinion that it was a mere naked right which was so assigned. Any right acquired by the United States becomes of slight significance because, for reasons hereinafter stated, I have come to the conclusion that the decrees upon which the United States depends to enforce its claim to these surplus moneys were not intended to have and did not have any extraterritorial effect or application. Before, however, taking up for decision this question of the extraterritorial extension of the decrees upon which the intervenor relies, and assuming for the moment that the decrees possessed extraterritorial power, it would still be impossible to sustain the right of the intervenor to enforce these decrees in our jurisdiction because of their confiscatory character.

Turning to the decree of November 28, 1918, by which it is asserted that the " R. S. F. S. R. confiscated and took over the assets of insurance companies in Russia and by which all of the obligations of these companies were repudiated," and to the decree of April 18, 1918, wherein the rights of shareholders are destroyed and their right to make any claim under their shareholdings extinguished, there arises the important question as to whether the confiscating government abroad by destruction of the corporate entity of the Moscow Fire Insurance Company and the

rights of its shareholders therein could at the same time confiscate, under our system of laws, the interest which a shareholder had in property being administered here and represented by such shares or interest.

The United States in pressing its claim as suitor cannot ask to be relieved from the position which an ordinary suitor occupies, merely because it is a sovereign. It is bound by the public policy of the State of New York and by that of the nation in the same manner as private litigants. (*Standard Oil Co.* v. *United States,* 267 U. S. 76, 79; *United States* v. *The Thekla,* 266 id. 328, 339; *Folk* v. *United States,* 233 Fed. 177, 192; *United States* v. *Midway Northern Oil Co.,* 232 id. 619, 631; *Sweet* v. *United States,* 228 id. 421, 428; *Chase* v. *United States,* 222 id. 593, 596; *United States* v. *Stinson,* 197 U. S. 200, 205; *Central Trust Co. of New York* v. *Treat,* 192 Fed. 942; *United States* v. *Walker,* 139 id. 409, 412; *Staten Island Hygeia Ice & Cold Storage Co.* v. *United States,* 85 F. [2d] 68.)

When a sovereignty submits itself to the jurisdiction of a court of equity and prays its aid, its claims and rights are to be adjudicated by every principle and rule of equity applicable to the claims and rights of private parties under similar circumstances. (*The Falcon,* 19 F. [2d] 1009, 1014.)

In *United States* v. *Buford* (3 Pet. 12, 30) the Supreme Court said: " It can require no argument to show, that the transfer of any claim to the United States cannot give to it any greater validity than it possessed in the hands of its assignor." (See, also, *Briggs* v. *A Light Boat,* 7 Allen [89 Mass.], 286, 297; *United States* v. *Perkins,* 163 U. S. 625, 630.)

The attempted enforcement of these confiscatory Russian decrees under the assignment received by the United States, therefore, cannot change our public policy nor can the provisions of our Constitution which prevent confiscation of property and require compensation when it is legally taken, be thus overridden. (*Brown* v. *United States,* 8 Cranch, 110, 123, 127, 128.)

Even a treaty cannot change or violate the Constitution and must be made subordinate thereto. The treaty-making power does not authorize the Executive to do what the Constitution forbids. (*The Cherokee Tobacco,* 11 Wall. 616, 621; *Geofroy* v. *Riggs,* 133 U. S. 258, 267; *Matter of Beale,* 2 Fed. Supp. 899; affd., 71 F. [2d] 737.)

The funds which it is asserted these decrees reach and by virtue of which the Litvinov assignment passes title to the United States have always been located within this State. The Supreme Court has decided that the *res* was in process of being administered and

that the jurisdiction and control of the said *res* was in the State of New York (296 U. S. 463) and our courts here have many times so decided.

The actual situs of the surplus having been in a depositary within this State either with trust companies under the Insurance Law or the defendant bank by court order, this conferred upon the courts of this State full dominion over such deposit, held, as it was, by law or order of our courts. (*Clark* v. *Williard*, 294 U. S. 211, 214; 292 id. 112, 123; *City Bank* v. *Schnader*, 293 id. 112, 118; *Pennington* v. *Fourth National Bank*, 243 id. 269, 271; *Spencer* v. *Myers*, 150 N. Y. 269; *Vladikavkazsky Railway Co.* v. *New York Trust Co.*, 263 id. 369; *Petrogradsky M. K. Bank* v. *National City Bank*, 253 id. 23.)

The intervening claimant must submit to the mandate of the municipal law that has the physical control of that which it would reduce to its possession. (*Clark* v. *Williard, supra.*) The question who is the owner of the claim depends for its answer upon the law of the place where the securities or deposit are located. (*Burnet* v. *Brooks*, 288 U. S. 378.)

The deposit here in question was created by New York law (Insurance Law, § 27). The surplus was created by the same law (Insurance Law, § 63). It was invested in domestic securities.

Normally, at the end of domestic liquidation the surplus would have been remitted to a domiciliary receiver. (*Matter of People* [*Norske Lloyd Ins. Co.*], 242 N. Y. 148; *Matter of People* [*City Equitable Fire Ins. Co.*], 238 id. 147; *Matter of People* [*Russian Reinsurance Co.*], 255 id. 415; *Matter of People* [*Moscow Fire Ins. Co.*], Id. 432.) Solely because of the fact that Russia was not recognized in 1931 when the funds would normally have been transmitted, such remission could not take place, and this surplus left over after the domestic liquidation was directed to be disposed of here. (*Matter of People* [*Russian Reinsurance Co.*], 255 N. Y. 415; *Matter of People* [*Moscow Fire Ins. Co.*] Id. 432; *Matter of People* [*First Russian Ins. Co.*], Id. 415.)

The intervenor argues that the maxim *mobilia sequuntur personam* controls the disposition of this fund, that it is a debt and that the situs of a debt is at the domicile of its owner. (*Blodgett* v. *Silberman*, 277 U. S. 1.)

To accept this maxim as ruling here would confer upon it the position of a controlling principle of exclusive application when it is at best a fiction; and such application would ignore the facts that prior to 1931 and in 1931 when the surplus funds were taken over for disposition by our courts the funds were invested in domestic securities held on deposit in New York, title to which was vested

in the Superintendent of Insurance and Bankers Trust Company as trustees and that the investments so held were domestic obligations of the city of New York and of the United States of America. It also stands conceded that the cash now held by the defendant trust company represents a recent conversion of the residue of these same securities.

Thus the securities comprising the funds must be regarded as tangibles and not intangibles and cannot be considered mere choses in action or a debt. Nor can the principles of situs mentioned in the succession tax cases (*Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204, 214; *First National Bank* v. *Maine*, 284 id. 312) determine the situs or apply here.

But even if the property were to be considered a mere debt and intangible as is argued by the intervenor, the State of New York would have the same dominion over it, for its "locality must be taken to be the place where the debt was in the ordinary course recoverable." (*Matter of Russian Bank for Foreign Exchange*, L. R. [1933] Ch. Div. 745, 767; *Security Savings Bank* v. *California*, 263 U. S. 282, 285; *Matter of Houdayer*, 150 N. Y. 37.)

In *Clark* v. *Williard* (294 U. S. 211, at p. 214), referring to the title of a foreign statutory successor of a dissolved foreign corporation, the Supreme Court said: "He must submit, as must they, to the mandate of the sovereignty that has the physical control of what he would reduce to his possession."

In *Pennington* v. *Fourth National Bank* (*supra*) the Supreme Court said (243 U. S. at p. 271): "The Fourteenth Amendment did not, in guaranteeing due process of law, abridge the jurisdiction which a State possessed over property within its borders, regardless of the residence or presence of the owner. That jurisdiction extends alike to tangible and intangible property. Indebtedness due from a resident to a non-resident — of which bank deposits are an example — is property within the State."

We now come to consider the effect of these confiscatory decrees upon these funds so located within our jurisdiction and under control and disposal by our courts.

The statutes of a foreign State have no effect beyond the limits of the sovereignty from which the authority of such a statute is derived. (*Matter of Waite*, 99 N. Y. 433, 438; *Hilton* v. *Guyot*, 159 U. S. 113, 163.)

In *Hilton* v. *Guyot* (159 U. S. 113, 163) the Supreme Court said: "No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree,

shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call ' the comity of nations.' "

In *The Antelope* (10 Wheat. [U. S.] 66, 122) the Supreme Court said: " No principle of general law is more universally acknowledged than the perfect equality of nations. Russia and Geneva have equal rights. It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone. * * * As no nation can prescribe a rule for others, none can make a law of nations."

In *Simonin* v. *Mallac* (6 Jur. [N. S.] 561, 565) the court said: " France may make laws for her own subjects, and impose on them all the consequences, good or evil, that result from these laws; but England also may make laws for the regulation of all matters within her own territory. Either nation may refuse to surrender its own laws to those of the other, and if either of them is guilty of any breach of the *comitas* or *jus gentium,* that reproach should attach to the nation whose laws are least calculated to insure the common benefit and advantage of all."

The enforcement within this jurisdiction and by courts of this nation of foreign laws and decrees and of contracts dependent upon such foreign decrees for their validity, is not, therefore, to be demanded as a matter of strict right. Such effect is permitted, if at all, only because of comity which exists between states and nations. Every independent community must judge for itself how far this comity ought to extend. Comity is voluntary and not obligatory and cannot supersede discretion, conceding it rests upon a much broader principle than mere accommodation or courtesy. Comity extended to other nations is no surrender of sovereignty for it is the voluntary act of the nation who offers it. Comity, however, is inapplicable when contrary to public policy or prejudicial to the interests of the state or nation whose courts are asked to respect it. (*Bank of Augusta* v. *Earle,* 13 Pet. 519, 589; *Fisher, Brown & Co.* v. *Fielding,* 67 Conn. 91; 34 A. 714.)

It, therefore, appears important to determine what is the public policy of the State of New York in order that the question may be decided whether principles of comity shall govern in enforcing confiscatory decrees of a foreign government, or whether the principles of justice and equity imbedded in our own public policy which conflict with the principles involved in the Russian decrees shall prevail.

The public policy of the State of New York is to be found in its Constitution, its laws and judicial decisions. (*Mertz* v. *Mertz,* 271 N. Y. 466.) Public policy is a rule of law and represents the policy of the law in relation to its administration.

The law of New York is clear that when a corporation is dissolved or liquidated its assets are not subject to confiscation or escheat by the State. These assets are the property of all the stockholders and creditors wherever they may be and are to be held for distribution to such persons. (*People* v. *O'Brien*, 111 N. Y. 1; *Matter of Long Sault Development Co.*, 212 id. 1; *People* v. *National Trust Co.*, 82 id. 283, 287; *Shayne* v. *Evening Post Pub. Co.*, 168 id. 70; *Lord* v. *Equitable L. A. Society*, 194 id. 212, 227, 228.)

The title of a foreign liquidator to assets in New York will only be recognized and enforced here when it appears that the funds will be dealt with in the interests of creditors and shareholders.

In *Matter of Waite* (*supra*) the court said: " The titles of foreign statutory assignees are recognized and enforced here, (through comity) when they can be, without injustice to our own citizens, and without prejudice to the right of creditors pursuing their remedies here under our statutes; provided also, that such titles are not in conflict with the laws or the public policy of our State."

In remitting funds to other jurisdictions our courts may fix and will ordinarily attach conditions to such remissions in order to protect the rights of its own citizens who are shareholders or creditors. (*Matter of People* [*City Equitable Fire Ins. Co.*], 238 N. Y. 147, 157; *People* v. *Granite State Prov. Assn.*, 161 id. 492; *Martyne* v. *American Union Fire Insurance Co.*, 216 id. 183, 192.)

In *Barth* v. *Backus* (140 N. Y. 230) it was determined that the title of a foreign assignee for the benefit of creditors could not be given extraterritorial effect in New York to preclude New York creditors from attaching property in New York, which, of course, would give them a preferential position.

The courts of New York will not enforce the tax laws or penal laws of another State. (*Colorado* v. *Harbeck*, 232 N. Y. 71; cf. *Milwaukee County* v. *White Co.*, 296 U. S. 268.) Foreign bankruptcy laws, revenue laws and penal laws also will not be enforced in New York. (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 112.) Its courts will not aid in enforcing in behalf of another government a penalty or forfeiture. (*James & Co.* v. *Second Russian Ins. Co.*, 239 N. Y. 248.)

The United States Supreme Court has recognized our New York rule of public policy in this regard in *Cole* v. *Cunningham* (133 U. S. 107, 122, 123) where it was said concerning that rule: " The rule in that State is, that by the comity of nations, the statutory title of foreign assignees in bankruptcy is recognized and enforced when it can be done without injustice to the citizens of the State, and without prejudice to creditors pursuing their remedies under

the New York statutes, provided also that such title is not in conflict with the laws or public policy of the State, and that the foreign court had jurisdiction of the bankrupt."

Every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory. (*Pennoyer* v. *Neff*, 95 U. S. 714, 722; *Clark* v. *Williard*, 292 id. 112; 294 id. 211, 214.)

It must follow as a consequence of this exclusive jurisdiction which each State possesses that every State has the power to determine for itself the conditions upon which property situated within such territory, both personal and real, may be acquired, enjoyed and transferred.

Based upon these conceptions of the principles of comity there is next to consider whether the public policy of this State conflicts with these confiscatory decrees of the foreign country to such an extent that our courts should not extend to those decrees, upon the principle of comity, the effect given to them in the foreign State.

The litigation which followed the Russian revolution has given the answer repeatedly to this problem. Our courts, *prior* to the recognition of the Soviet government, determined that they would not give extraterritorial effect to the Soviet decrees of confiscation as to any private property located in the State of New York including similar deposit accounts. (*James & Co.* v. *Second Russian Ins. Co.*, 239 N. Y. 248, 257; *Sokoloff* v. *National City Bank*, Id. 158; *Russian Reinsurance Co.* v. *Stoddard*, 240 id. 149; *Petrogradsky M. K. Bank* v. *National City Bank*, 253 id. 23.)

And our courts also decided *after the recognition* of the Soviet Union by this nation that these decrees would not be enforced because contrary to our public policy. (*Vladikavkazsky Ry. Co.* v. *New York Trust Co.*, 263 N. Y. 369.)

In *Vladikavkazsky Ry. Co.* v. *New York Trust Co.* (*supra*), which is directly in point, a Russian railroad corporation sued to recover a deposit in a New York bank. The bank defended upon the ground that the railroad had been nationalized by decrees of the Soviet government and that accordingly the directors were acting without authority in making claim to such deposit. Our Court of Appeals decided that the confiscation of assets in this State if intended by the Russian government by these decrees would not be enforced even *after* recognition of the Soviet government because such confiscatory decrees offended our public policy.

The court held that the deposit was made in New York city, the home of the bank, which the court determined was the place where the contract obligation was created and was to be performed entirely outside of Russian jurisdiction; that the laws of foreign

governments have extraterritorial effect only by comity and that the principle which determines whether we shall give effect to foreign legislation is our own public policy and that whenever there is a conflict between our public policy and comity, our own sense of justice and equity as indicated by our public policy must predominate. In reaching this conclusion, the court said:

" The principle which determines whether we shall give effect to foreign legislation is that of public policy. (*Russian Reinsurance Co.* v. *Stoddard, supra; Joint Stock Co.* v. *National City Bank,* 240 N. Y. 368, 377; *Russian Socialist Federated Soviet Republic* v. *Cibrario,* 235 N. Y. 255, 263.)

" Where there is confliction between our public policy and comity, our own sense of justice and equity as embodied in our public policy must prevail. (*Russian Socialist Federated Soviet Republic* v. *Cibrario, supra.*)

" It is hardly necessary to state that the arbitrary dissolution of a corporation, the confiscation of its assets and the repudiation of its obligations by decrees, is contrary to our public policy and shocking to our sense of justice and equity. That the confiscation decree in question, clearly contrary to our public policy was enacted by a government recognized by us, affords no controlling reason why it should be enforced in our courts. (*Baglin* v. *Cusenier,* 221 U. S. 580.)

" We enforce the same principle even in regard to statutes of sister States. (*Barth* v. *Backus,* 140 N. Y. 230, 239.)

" The fact that the present Russian government was not recognized was not the basis of our refusal to give effect to its decrees nationalizing corporations and confiscating their property. During the period when those decisions were made we recognized and enforced ' mere ordinary legislation ' relating to ' every day transactions of business or domestic life.' (*Petrogradsky M. K. Bank* v. *National City Bank, supra; Matter of People [First Russian Ins. Co.],* 255 N. Y. 428, 432.)

" Prior to recognition we clearly intimated that our decision would have been the same if at the time recognition had been granted. (*James & Co.* v. *Second Russian Ins. Co.,* 239 N. Y. 248, 257.)

" The general statement contained in the opinion in *Salimoff & Co.* v. *Standard Oil Co.* (262 N. Y. 220) to the effect that recognition of a *de facto* government as a *de jure* government is retroactive in effect and validates all the acts of the government so recognized from the commencement of its existence, must be read in connection with its context and as so read it did not refer to acts sought to be given effect extraterritorially." (See, also, *Dougherty* v. *Equitable Life Assurance Society,* 266 N. Y. 71, 90, 106.)

The ruling in the *Vladikavkazsky Railway* case seems to be controlling upon the questions which are involved here, even if we assume that the Soviet laws at the time they were passed were intended to reach the surplus deposits of Moscow Insurance Company in this country.

The decisions of our Court of Appeals are in complete accord upon this question and are consonant with a long line of cases in this State which have been heretofore cited and which have protected the rights of creditors and shareholders to funds within this State against claims asserted from outside of our State whenever these run counter to the public policy which we maintain and proclaim.

But in addition our Legislature has recently seen fit to declare the public policy of this State as one to protect creditors and shareholders against such confiscatory decrees. (Civ. Prac. Act, § 977-b, as added by Laws of 1936, chap. 917.)

Indeed, it is against the public policy of the United States here suing, to recognize and enforce a title based upon confiscation. Chief Justice MARSHALL in *United States* v. *Percheman* (7 Pet. 51, 87) said: " That sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated and private rights annulled."

The same rule which we enforce here has been adopted and enforced in the courts of the United States so that assets outside of Russia of the Moscow Fire Insurance Company would be considered under the circumstances proved here to have become the property of stockholders subject to payment of its creditors. (*Curran* v. *Arkansas*, 15 How. 304; *Bacon* v. *Robertson*, 18 id. 480, 486; *Farrington* v. *Tennessee*, 95 U. S. 679, 687; *Greenwood* v. *Freight Co.*, 105 id. 13, 19; *Stearns Coal & Lumber Co.* v. *Van Winkle*, 221 Fed. 590, 595; *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50, 59; *Gardiner* v. *Automatic Arms Co.*, 275 Fed. 697.) The District Court which considered the very claims involved in this action dismissed the claim of the government upon this ground. ( *United States* v. *Bank of New York & Trust Co.*, 10 Fed. Supp. 269, 272.) The Supreme Court of the United States has itself limited the application of foreign law in accordance with the foregoing principles. (*Baglin* v. *Cusenier*, 221 U. S. 580, 596; *Second Russian Ins. Co.* v. *Miller*, 268 id. 552.)

In the latter case the United States Supreme Court refused to give extraterritorial effect to a Russian ukase in order to destroy contract rights in this country and to create the result of a deprivation of property located here

But, even if the public policy of the United States was not as has just been stated, the result to be reached in this litigation could not be different.

We are concerned here with moneys on deposit in New York. They are held under an obligation to be paid to those to whom they belong under the public policy of this State. No public policy of the United States can interfere with this deposit contract or the terms under which these funds are held in this State. It is the public policy of this State which determines the effect of the Soviet decrees.

In *The Kensington* (183 U. S. 263, 269) the United States Supreme Court said, "neither by comity nor by the will of contracting parties can the public policy of a country be set at naught."

And the courts of the United States also are bound to give effect to that policy. (*Bank of Augusta* v. *Earle*, 13 Pet. 519, 597; *Cole* v. *Cunningham, supra; Worthen Co.* v. *Thomas*, 292 U. S. 426, 433.)

Again it is the law that rights which have been acquired here will be protected by our courts whether they belong to non-residents of the State of New York or foreigners to the United States or inhere in its own citizens or resident creditors.

"We have refused to adopt the distinction made in some of the States and have placed the right of a creditor coming here from the State of a common domicile upon the same footing as that of a citizen or resident creditor." (*Barth* v. *Backus*, 140 N. Y. 230.)

Furthermore, under the Fifth Amendment of the United States Constitution, alien friends are protected by its provision that private property shall not be taken for public use without just compensation. Alien friends are entitled to the protection of this constitutional provision as well as citizens of the United States. In *Russian Volunteer Fleet* v. *United States* (282 U. S. 481, 491, 492), Chief Justice HUGHES declared the principle: "As alien friends are embraced within the terms of the Fifth Amendment it cannot be said that their property is subject to confiscation here because the property of our citizens may be confiscated in the alien's country. The provision that private property shall not be taken for public use without just compensation establishes a standard for our Government which the Constitution does not make dependent upon the standards of other governments."

Since the property in question has a situs here, it would seem to be protected by the specific and unequivocal provisions of the Fifth Amendment against a taking of the same from the stockholders and creditors of Moscow Fire Insurance Company without compensation and through the compulsion of confiscatory decrees, for to enforce these confiscatory decrees would be contrary to constitutional guarantees.

Nor can it be urged that our courts are bound to recognize *ab initio* all acts of the newly recognized Russian State, the Union of Soviet Socialist Republics.

While it is a well-established rule that where a new government is set up in a foreign country and has been recognized, the acts of that government will be recognized from the time it took control and was in power in the foreign State ( *Underhill* v. *Hernandez*, 168 U. S. 250), such *ab initio* recognition, however, is only a recognition of acts done within its own territory and cannot validate acts performed prior to recognition which seek to affect private property rights beyond the borders of the territory of the nation thus subsequently recognized. (*Oetjen* v. *Central Leather Co.*, 246 U. S. 297; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220; *Dougherty* v. *Equitable Life Assurance Society*, 266 id. 71, 87; *Princess Paley Olga* v. *Weisz*, L. R. [1929] 1 K. B. 718; *Luther* v. *Sagor & Co.*, L. R. [1921] 3 id. 532, 545; *Cottam & Co.* v. *Comision Reguladora*, 149 La. 1026; 90 So. 392.)

The courts of this country have the right to sit in judgment of acts done in this country or sought to be enforced here from without our boundaries. It is only as to acts of another government done within its " own territory " that the courts of this country will not sit in judgment. ( *Underhill* v. *Hernandez*, 168 U. S. 250, 253; *Lehigh Valley R. R. Co.* v. *State of Russia*, 21 F. [2d] 396, 401.)

The intervenor also cites *Canada Southern Railway* v. *Gebhard* (109 U. S. 527) and *Modern Woodmen of America* v. *Mixer* (267 id. 544) to the effect that the legal relations of the members of a corporation to the corporation and to each other must be regulated and controlled by the law of the jurisdiction in which the corporation is organized. Intervenor contends, therefore, that because the corporate entity of the Moscow was destroyed in Russia and all rights of shareholders were annulled, this prevents the individuals who are the shareholders from making any recovery out of the assets of the Moscow located here and that they are bound by the act of the government which created the corporation and also destroyed it and that they can make no claim based upon their shareholdings to the funds here. It is no doubt true that legal relations of members of a foreign corporation to the corporation *inter sese* must be regulated by the law of corporate jurisdiction. Conceivably a government can destroy and end a corporation's existence, can compel its dissolution and require a distribution of its assets. The decree destroying and annulling property rights in the shares of such a corporation is no doubt enforcible in the foreign jurisdiction or domicile of the corporation. Conceivably a decree or a statute affecting shares might be enforced here to some

extent and under certain circumstances. (Cf. *Converse* v. *Hamilton*, 224 U. S. 243; *Chandler* v. *Peketz*, 297 id. 609; *Milwaukee County* v. *White Company*, 296 id. 268.)

But in the exercise even of governmental powers, which is the type of power underlying the confiscatory decrees, while every sovereign possesses the broadest powers, these stop with confiscation. For instance, the taxing powers committed to our Congress are extraordinary because it may lay and collect taxes on incomes from whatever source derived under the Sixteenth Amendment to the Constitution and this power is not limited by the Fifth Amendment (*McCray* v. *United States*, 195 U. S. 27; *Billings* v. *United States*, 232 id. 261; *Brushaber* v. *Union Pac. R. R. Co.*, 240 id. 1) unless the result is unreasonable and arbitrary, amounting to a confiscation rather than a tax. (*Nichols* v. *Coolidge*, 274 U. S. 531; *Blodgett* v. *Holden*, 275 id. 142; *Untermyer* v. *Anderson*, 276 id. 440.)

In this respect the taxing power of the Federal government in its sovereign capacity is not even confined within the geographical limits of the United States as far as *its own citizens* are concerned for it may tax the income of the citizen even though the *citizen* receives income and the property from which it arises are *both* outside of the territorial limits of the United States. (*United States* v. *Bennett*, 232 U. S. 299; *Cook* v. *Tait*, 265 id. 47.) And within the United States it may even tax the income from property located here which is owned by a non-resident alien. (*De Ganay* v. *Lederer*, 250 U. S. 376; *Lord Forres Case*, 25 U. S. Board of Tax Appeals, 154, 160.)

These extraordinary results are thus permissible under the exercise of a fundamental governmental power provided there is *no confiscation*. It is one thing to tax; it is wholly another to take all of the property out of which a tax arises.

Here, the seizure of the property abroad was under the decrees in the exercise of a fundamental governmental power — the power of eminent domain, but by them compensation was denied and confiscation results. Such a result cannot be permitted under the law of this jurisdiction for when no distributive interest is recognized, as here, and property rights of individuals behind the stock certificates are confiscated as is here attempted, the power to enforce such a result under our laws must necessarily fail.

When no distribution or property interest is recognized but, on the other hand the property rights of the individuals behind the shares are thus confiscated, another serious question immediately arises. When that power, enforcible abroad, comes here and asks for a total destruction of all rights, the same rule of public policy

intervenes to forbid such execution and such a result without our borders. (*Russian Commercial & Industrial Bank* v. *Comptoir D'Escompte de Mulhouse*, L. R. [1925] A. C. 112, 125; *Disconto-Gesellschaft* v. *United States Steel Co.*, 267 U. S. 22.) In the *Russian Commercial Bank* case it was doubted whether such an order destroying the shares could be effective to confiscate or destroy shares held by persons out of the jurisdiction of the Soviet government.

No difficulty arises in reaching a decision under our law upon this question of the status of the property rights behind destroyed shares in a fund located here, for the reason that no jurisdiction can possibly reside under the law of Russia, the domicile of the corporation, to determine the legal effect of acts which are performed in this territory where the law of a different sovereign must necessarily prevail and control. The sovereign assignor if it were here suing as well as the sovereign assignee now intervening must both submit the decision of any rights they have to the municipal law and the forum in charge of the distribution of the fund of which they seek possession. (*Clark* v. *Williard, supra; Dougherty* v. *Equitable Life Assurance Society, supra; Hutchison* v. *Ross*, 262 N. Y. 381.)

As an illustration of the different capacities recognized by our courts in denying the enforcement of foreign usurpation or expropriation of property or foreign invasion of natural liberty, the slave cases may be cited, particularly an early case arising in this State. (*Lemmon* v. *People*, 20 N. Y. 562.) Persons may possess certain characteristics, qualities and capacities in this State even though such may not be recognized or accorded to them by their foreign domicile. (*Lemmon* v. *People*, 20 N. Y. 562; *Polydore* v. *Prince*, 19 Fed. Cas. No. 11,257; *Second Russian Ins. Co.* v. *Miller*, 268 U. S. 552.)

In *Lemmon* v. *People* (*supra*) our Court of Appeals in acknowledging the right of Virginia to maintain its system of slavery, refused to recognize the system as binding on New York because slavery was repugnant to natural justice and right, found no support in any principle of international law and was antagonistic to the genius and spirit of republican government. It was determined on the other hand that liberty is the natural condition of men and is world wide, while slavery is local and beginning in physical force can only be supported and sustained by positive law. In refusing to recognize or extend any law of comity toward a slaveholder passing through New York with slaves, or allow the law of the sovereignty which sustained the relation of master and slave to be administered as a part of the law here, our Court of Appeals said, " The public law exacts no obligation from this State to enforce the municipal

law which makes men the subject of property; but by that law the strangers stand upon our soil in their natural condition as men. Nor can it be justly contended that by the principle which attributes to the law of domicil the power to fix the civil *status* of persons, any obligation rests on the State to recognize and uphold within her territory the relation of slave owner and slave between strangers." (p. 631). (See, to the same effect, *Polydore* v. *Prince*, 19 Fed. Cas. No. 11,257.)

It would, therefore, appear that, even if these decrees could have or were intended to have an extraterritorial effect, since they are confiscatory and since such confiscation of property without compensation offends our sense of justice and equity and shocks our public conscience, our courts will not give them effect here. But as stated in the early part of this opinion, the decrees relied upon by the intervenor can have no extraterritorial effect and apparently that was the intention of the Russian legislation at the time of its passage in 1918. Claims to the contrary were uniformly ruled out. Such indeed were the decisions of the courts of England and elsewhere, wherever the question arose. (*The Jupiter*, 1925–1926 Ann. Dig. of Int. Law Cases, Case No. 100; affd., Court of Appeal, 1927, pp. 250, 253, 255; *Russian Bank for Foreign Trade*, L. R. [1933] Ch. Div. 745, 767; *Russian Commercial & Industrial Bank* v. *Comptoir D'Escompte de Mulhouse*, L. R. [1925] A. C. 112, 125; *Lecoutourier* v. *Rey*, L. R. [1910] Id. 262; *First Russian Insurance Company* v. *London & Lancashire Ins. Co., Ltd.*, L. R. [1928] Ch. Div. 922; *Sedgwick, Collins & Co.* v. *Rossia Insurance Co. of Petrograd*, L. R. [1926] 1 K. B. 1, 15; affd., [1927] A. C. 95; *Luther* v. *Sagor*, L. R. [1921] 3 K. B. 532, 545; *Lazard Bros. & Co.* v. *Midland Bank, Ltd.*, L. R. [1933] A. C. 289; *Union of Soviet Socialist Republics* v. *Onou*, 69 Sol. J. 676; K. B. May 13, 1925; *Union of Soviet Socialist Republics* v. *Belaiew*, 42 T. L. R. 21; *Ginsberg* v. *Deutsche Bank,* [1928] Justice WOCHENSCHRIFT, 1232, 1233, Kammergericht, Berlin.) (See, also, *Council of Russian Orthodox Community in Copenhagen* v. *Legation of R. S. F. S. R.*, 1925–1926 Ann. Dig. of Int. Law Cases, Case No. 16; 24 Sup. Ct. Denmark; *Wilbuschewitz* v. *Zurich*, 1926, 53 Clunet, 1110, 1113; 1925–1926 Ann. Dig. of Int. Law Cases, Case No. 74; 96 Trib. Fed. Switzerland; *Cockerill* v. *La. Union et Phenix Expagnol*, cour d'Appel de Paris, 12, 23, 30; affd., 61 Clunet, 662; 58 id. 400.)

To support its claim to the contrary the intervenor called an expert in Russian Imperial law and also an expert in Russian Soviet law. The testimony of the former definitely establishes that the law of Imperial Russia always and continuously provided that

private property could not be taken for public use without compensation and that upon the dissolution of a corporation the assets were distributed in accordance with our own law by payment of claims of creditors and an awarding of the balance to shareholders in accordance with their respective rights.

The testimony of Professor Plotkin, the expert on Russian Soviet law, was supplemented by a number of decrees which were offered in evidence; by certain circulars which were issued by the revolutionary government in Russia; by court decisions and by professorial opinions and writings. Clearly, if R. S. F. S. R. which enacted the confiscatory decrees acquired title to the funds involved herein, it did so under the decree of November 28, 1918, as interpreted by the instructions of February 2, 1919, or its title was obtained through the decree of November 28, 1918, and whatever added force that decree received from the decree of March 4, 1919.

The decree of November 28, 1918, by which insurance business was nationalized, contains a rather limited title — " On the organization of the insurance business in Russia." This title may be resorted to in order to determine the intent of the legislation. (*People ex rel. Commonwealth Ins. Co.* v. *Coleman*, 121 N. Y. 542, 544; *People* v. *Davenport*, 91 id. 574.)

There is intrinsic evidence within the decree itself that it was to operate within the boundaries of the Russian Republic, for it provides as to rural and municipal insurance organizations so operating " within the boundaries of the Russian Republic " that they are taken over as to property of the R. S. F. S. R.

The Commission appointed by section 3 of the decree was set up for the immediate organization of the insurance business, that is to say, for the enforcement of the State monopoly, and it further provided for the liquidation of " parts " of insurance institutions and did not refer to companies.

The Commission appointed was intrusted by the terms of the decree with liquidation of the property and assets of insurance organizations " disclosed at the time of their liquidation or remaining on hand after their liquidation," or, as the expert translated it, " which happened to be on hand in the process of liquidation." It was such assets that were to become and became the property of the R. S. F. S. R.

The decree also provided for the reorganization of the business as a State monopoly and the liquidation of the insurance organizations and institutions which were to be accomplished not later than April 1, 1919.

The expert conceded that at the time of enactment of this decree on November 28, 1918, by R. S. F. S. R. that revolutionary State

was only recognized by Germany, Austria and Turkey and by no other countries.

The instructions which were issued to the Fire Insurance Division (F. I. D.) as liquidator on February 2, 1919, defined the liquidation in section 5 of the instructions as " the transfer of the entire property and the files of the organs of liquidation to F. I. D. or to other institutions at its direction." The tasks of the delegates in charge of liquidation were described therein as " the ascertainment on the strength of the available data of the assets and liabilities of the liquidated organ and the compilation at terms specified below of a financial report; the preparation of the liquidated organ in a state fit for the transfer and, in particular, the compilation of the inventory schedules of the properties and files; the transfer of property and files to institutions specified in the preceding article," and when the files and property were in condition fit for the transfer it was provided that said files and property should be turned over to the institutions and persons indicated by the F. I. D. Further examination of these instructions indicates that purely local liquidation was the intention and scope thereof. Nor did it appear in any way that the F. I. D. nor the delegates made any inventory of, or were concerned with property outside of Russia though the instructions required a financial report, a property report and weekly reports on the activities of the delegates.

The decree of March 4, 1919, bears as its title " The liquidation of obligations of State enterprises." That decree defines State enterprises as those which have theretofore been nationalized, sequestrated, former governmental, etc. It refers to those State enterprises which, on the basis of the decree regarding the financing of enterprises beginning with March 1, 1919, *were being supplied with necessary funds exclusively through separate budget financing.*

It was as to these enterprises that had been either nationalized or sequestrated and were being locally supplied with funds that their stock certificates and shares of joint stock companies were declared null. It was property which had been reached locally in the process of nationalization within Russia that the scope of this decree affected. This conclusion is supported by the later decrees enacted by the Soviet State which expressly declare that nationalization had no application to industrial property not factually taken into possession or control by the Soviet State prior to May 22, 1922.

The circulars which were offered in evidence and issued by various officials of the R. S. F. S. R. were stated by Professor Plotkin not to have any legislative force because issued by the People's Commissar for Foreign Affairs which was without authority to either

legislate or interpret legislation. He characterized these as affecting only the property rights of Russian citizens resident abroad, rights legally belonging to such citizens.

These circulars, however, were interpreted by the English Court of Appeal in *The Jupiter* (*supra*) which affirmed the lord chancellor's decision, as indicating that the decrees which had been issued affecting property rights by the Russian Soviet government were limited to property relations on the territory of the R. S. F. S. R. only. Circular No. 42 bears out that interpretation for it says, " The People's Commissariat for Foreign Affairs takes the position that the legislation of each country establishing a certain system of property rights is in force only within the territorial limits of this country but that within the limits of this territory it extends to juridical property relations independently of the citizenship of the subjects of these juridical relations. Therefore, the system of property rights established by decrees of the Russian Soviet power regulates only property relations on the territory of the R. S. F. S. R. Juridical property relations, the objects of which are outside of the territory of the R. S. F. S. R. and not connected with it, cannot be considered outside of the borders of the R. S. F. S. R. on the basis of Russian laws and are subject to the action of local legislation, independently of the citizenship of the subjects of these juridical relations, even though the latter be Russian citizens."

This notice sent to Plenipotentiaries of the R. S. F. S. R. abroad helps to confirm the intent of the local legislation which as shown above intrinsically indicated that it should have no extraterritorial force.

Circular No. 194, issued on September 20, 1923, by the Commissariat of Justice, as well as Circular No. 329, dated August 23, 1925, issued by the People's Commissariat for Foreign Affairs, are to a similar purport and assist the inference that these confiscatory decrees were solely territorial in effect.

Against such view the intervenor contends, however, that the decision of the Supreme Court of Cassation of R. S. F. S. R. dated September 4, 1923, in the case of *Archangel Administration of the Commercial Port* v. *Davidson*, representing the ship owner Schmidt, determined that these decrees did have extraterritorial effect. It is very evident, however, that the decree involved in that case relating to the Russian fleet was based upon a fundamental proposition of international law that ships were inseparably connected with the territory of the R. S. F. S. R. and with the Russian ports at which they were registered and that they constituted a floating part of the territory of Russia itself. That decision, therefore,

conforms to the well-recognized principle applicable to every nation that " a vessel is deemed part of the territory of the country to which it belongs." ( *United States* v. *Rodgers*, 150 U. S. 249.) This decision is to be given only that significance. It indeed confirms the thought that the decree was solely territorial for this ruling held that it reached and applied to the floating part of the territory of Russia. This is borne out by other decisions rendered by the Soviet courts.

On October 16, 1924, by decision No. 124, the Third Department of the People's Commissar of Justice, interpreting the decree of November 18, 1919, " on the annulment of life insurance contracts," which is pleaded by the intervenor and put in evidence, and upon which it bases its claim, held " the general annulment of agreements of life insurance does not extend to the territories located without the borders of the U. S. S. R. and particularly to the United States of North America."

Another element of great significance which appeared in the proof is that when the R. S. F. S. R. undertook to give extraterritorial effect to decrees *in pari materia*, it did so with complete clarity. In the instance of seizing and confiscating all of the property which belonged to the Romanoffs, that decree definitely provided that the R. S. F. S. R. seized all property " of whatever it consists and wherever it is located not excluding also deposits in great institutions in Russia as well as any foreign countries."

When the territory seized by the soviet State during the revolution was extended to that then occupied by White Russians the R. S. F. S. R. undertook to extend the application of existing decrees of nationalization to the territory taken from the White Russians, a procedure which would have been wholly unnecessary if these decrees already were intended to have or possessed extraterritorial effect.

The expert upon Soviet law produced by the intervenor did not refer in his testimony to any Soviet court decision which determined that Soviet law had application to assets abroad of any nationalized Russian corporation aside from the *Russian Fleet* case, which, of course, is distinguishable because based upon a universal concept of international law.

The Soviet law of property, therefore, regards the law of the place where the property is located as the only law to be applied in determining the question of ownership of such property.

The burden was on the intervenor to establish by a preponderance of evidence that there was an extraterritorial extension to these decrees. At the threshold the intervenor is met with presumption against it for " all legislation is *prima facie* territorial." (*American*

*Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 357.) But the case made out by the decrees themselves, the manner in which they were understood at home and interpreted at home and abroad requires a finding that they were strictly territorial in their effect and were so intended when enacted. .

For the foregoing reasons, judgment is directed against the intervenor, United States of America, and its petition is accordingly dismissed upon the merits.

All motions heretofore made to strike out evidence which remain undecided are denied, and the motion of the intervenor for judgment is also denied with an exception in favor of each party against whom such ruling is made.

The findings submitted by the respective parties have been passed upon and will be filed with this report.