ZITTMAN *v.* McGRATH, ATTORNEY GENERAL, SUCCESSOR TO THE ALIEN PROPERTY CUS-TODIAN.

NO. 298.

Argued February 28, 1951.—Decided May 28, 1951.

*Joseph M. Cohen* argued the cause and filed a brief for petitioner in No. 298.

*Henry I. Fillman* argued the cause for petitioner in No. 314. With him on the brief was *Otto C. Sommerich.*

*Ralph S. Spritzer* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Baynton, James L. Morrisson* and *George B. Searls.*

Mr. Justice Jackson delivered the opinion of the Court.

On December 11, 1941, petitioner Zittman, holder of claims against the Deutsche Reichsbank and the Deutsche Golddiskontbank, caused attachment warrants to be issued by the appropriate New York court and levied on accounts maintained by the debtors in New York City with the Chase National Bank. On January 21, 1942, petitioner McCarthy, holder of a claim against the Reichsbank, also attached its accounts with the Chase

Bank. Both attachments were followed by state court actions which were pursued to default judgments. The judgments remain unsatisfied because the attached funds were and are "frozen" by federal government foreign funds controls. The New York courts have repeatedly extended the ninety-day limitation provided for the sheriff to reduce the accounts to his possession or commence an action to do so,[1] so that the attachments, like the judgments, are outstanding.

The accounts were frozen June 14, 1941, by Executive Order No. 8785,[2] which extended to assets of German nationals freezing controls initiated by Executive Order No. 8389,[3] issued April 10, 1940, by the President, pursuant to the powers vested in him by § 5 (b) of the Trading With the Enemy Act.[4] The general effect of the basic order was to forbid "transactions" in the assets of blocked nationals, including all "transfers" of such funds.[5] In October, 1946, more than four and a half years after the levy of these attachments, the Alien Property Custodian issued Vesting Orders, which vested "that certain debt or other obligation owing to" the German bank "and any and all rights to demand, enforce and collect the same." The Chase Bank notified the Custodian that, due to the outstanding attachment levies,

---

[1] As provided for in N. Y. Civ. Prac. Act § 922.

[2] 3 CFR, 1943 Cum. Supp., 948, 6 Fed. Reg. 2897.

[3] 3 CFR, 1943 Cum. Supp., 645, 5 Fed. Reg. 1400.

[4] 40 Stat. 411, 415, as amended by Joint Resolution of May 7, 1940, 54 Stat. 179, and First War Powers Act of 1941, § 301, 55 Stat. 839.

[5] Executive Order No. 8389, as amended, provides:

"Section 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if . . . such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or

it could not release the accounts.[6]   Some sixteen months later, the Custodian petitioned the United States District Court for the Southern District of New York for a declaratory judgment that the petitioners "obtained no lien or other interest in" the attached accounts and that he was entitled to take the entire balances.   The District Court granted the relief sought,[7] and the United States Court of Appeals for the Second Circuit affirmed, *per curiam,* solely on the authority of *Propper* v. *Clark,* 337 U. S. 472.[8]   We granted certiorari.[9]   The question is whether the attachment levies were "transfers" forbidden by Executive Order No. 8389.

## I. RIGHTS OF THE JUDGMENT CREDITORS UNDER NEW YORK LAW.

In the New York courts, petitioners invoked one of several provisional remedies which, from time out of mind, New York has extended to its citizens against their nonresident debtors.   These, in appropriate circumstances,

---

since the effective date of this Order had any interest of any nature whatsoever, direct or indirect:

"A. All transfers of credit between any banking institutions within the United States . . . ;

"B. All payments by or to any banking institution within the United States;

.          .          .          .          .

"E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property by any person within the United States; and

"F. Any transaction for the purpose or which has the effect of evading or avoiding the foregoing prohibitions."

[6] The Attorney General has since succeeded to the functions and powers of the Alien Property Custodian, but, for convenience, the respondent interest will be referred to throughout as the Custodian.

[7] 82 F. Supp. 740.

[8] 182 F. 2d 349.

[9] 340 U. S. 882.

may take the form of receivership [10] or attachment.[11] While these two remedies differ in nature and incidents, they are alike in being available at the commencement or during the pendency of an action, are not independent but auxiliary in character, and are not designed finally to adjudge substantive rights but to secure such judgment as may be rendered. As employed in this case, attachment also was the sole basis of jurisdiction.

The attachment levy on bank balances is perfected by service of a certified copy of the warrant of attachment on the banking institution,[12] which is required to certify to the sheriff making the levy the balance due to the defendant.[13] The levy does not require the sheriff to take physical possession of any property, nor does it require any transfer of title. The effect is prescribed: "Any such person so served with a certified copy of a warrant of attachment is forbidden to make or suffer, any transfer or other disposition of, or interfere with, any such property or interest therein so levied upon, . . . or sell, assign or transfer any right so levied upon, to any person, or persons, other than the sheriff serving the said warrant until ninety days from the date of such service, except upon direction of the sheriff or pursuant to an order of the court." [14] The account attached must, on the sheriff's demand, be paid over to him within ninety days, unless, as here, the time has been extended by order of court, and the sheriff is authorized to institute an action within that time to recover amounts withheld.[15]

These creditors prosecuted their actions to judgments which could be satisfied only from attached property and

---

[10] N. Y. Civ. Prac. Act §§ 974–977.

[11] *Id.* §§ 902–973.

[12] *Id.* § 917 (2).

[13] *Id.* § 918.

[14] *Id.* § 917 (2).

[15] *Id.* § 922 (1).

by issuance of executions.[16]  An attachment merges in an execution when issued, but it is not annulled until the judgment is paid and remains in force to keep alive the lien on the property. *Castriotis* v. *Guaranty Trust Co.*, 229 N. Y. 74, 79, 127 N. E. 900, 902 (1920).

Execution, if issued, would require a transfer of credit and of funds, but this step has not been taken and, it is admitted, cannot be taken in these cases without a federal license.  While requirement of a federal license creates something of a contingency as to satisfaction of the judgments, as matter of New York law this does not deprive the judgment of its validity or the attachment of its lien. *Commission for Polish Relief* v. *Banca Nationala a Rumaniei*, 288 N. Y. 332, 338, 43 N. E. 2d 345, 347 (1942).

Although the provisional remedy of attachment, as used in this case, has served to provide the basis of jurisdiction and has created a lien to secure satisfaction of the judgment, it is clear that it has neither attempted nor accomplished any transfer of possession, for these attachments have been maintained for over nine years, and the accounts are still where they were before the attachments were levied.   That there has been no transfer of title to the funds by the proceedings to date also is clear.  If the judgment debtors chose to satisfy the judgments by other means, or to substitute an undertaking for the property attached, they could do so, and the accounts would be freed of the lien.[17]

Under state law, the position of these judgment creditors is that they have judgments, secured by attachments on balances owned by German aliens, good as against the debtors, but subject to federal licensing before they can be satisfied by transfer of title or pos-

---

[16] *Id.* § 520.

[17] *Id.* §§ 952, 953.

session. The Custodian claims, in a collateral attack, that federal courts should pronounce them wholly void and of no effect.

## II. Effect of Federal Foreign Funds Control on Attachment.

The Government, in the present action, relies heavily on General Ruling No. 12 under Executive Order No. 8389, issued April 21, 1942, some three to five months after these attachments were levied, and almost two years after issuance of the Executive Order which it purports to interpret.[18]  Then, for the first time, an attachment levy was specifically designated as a prohibited "transfer." The Government asks that it be construed to prohibit such attachments as here made and be applied retroactively to these attachments made before its promulgation. Whether an administrative agency could thus lump all attachments as prohibited "transfers," without reference to the nature of the rights acquired or steps taken under the various state laws providing for attachments, presents a question which we need not decide here. Some attachments may well be transfers, and thus prohibited.  We deal here only with an attachment under New York law relating specifically to bank accounts.

This General Ruling, as thus interpreted to forbid these attachments, would be not only retroactive but incon-

---

[18] General Ruling No. 12 under Executive Order No. 8389, 31 CFR, 1943 Cum. Supp., 8849, April 21, 1942, defined a prohibited "transfer" as ". . . any actual or purported act or transaction . . . the purpose, intent, or effect of which is to create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property and without limitation upon the foregoing shall include . . . the creation or transfer of any lien; the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order, or the service of any garnishment . . . ."

sistent and irreconcilable with the contentions made one day after its issuance by both the Treasury and the Department of Justice to the New York Court of Appeals. These Departments filed a brief *amicus curiae,* dated April 22, 1942, in the New York Court of Appeals in *Commission for Polish Relief* v. *Banca Nationala a Rumaniei, supra.* The case involved an attachment, identical in state law character with those here, of bank balances in New York of the National Bank of Rumania, which had been frozen by Executive Order prior to levy. The Government's brief was subscribed by the General Counsel of the Treasury and an Assistant Attorney General, both members of the New York bar, presumably familiar with the peculiarities of the New York law of attachment of bank accounts. It specifically called attention to General Ruling No. 12, and, referring to the claim of incompatibility between the attachment and the federal freezing program, it declared: "This is the first occasion in which a court of last resort in this country has been called upon to meet this issue . . . ." [19] It went on to advise the Court of Appeals definitely and comprehensively as to the rights of New York courts to proceed on the basis of the attachment there involved. In view of the Custodian's present contentions, it merits extensive consideration.

The New York courts were advised of five purposes of the Federal Government's program: "1. Protecting property of persons in occupied countries"; "2. Preventing the Axis, now our enemy, from acquiring any benefit from these blocked assets"; "3. Facilitating the use of blocked assets in the United Nations war effort and protecting American banks and business institutions";

[19] Brief of the United States as *amicus curiae,* p. 2, *Commission for Polish Relief* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332, 43 N. E. 2d 345 (1942).

454

"4. Protecting American creditors"; "5. Foreign relations, including post-war negotiations and settlements." [20]

To accomplish these purposes in relation to over seven billion dollars of blocked foreign assets, it was said that ". . . the Treasury has had to deal with the problem of litigation, particularly attachment actions, as affecting blocked assets," [21] and the position of the Treasury was represented as follows:

". . . the Treasury did not want to interfere with the orderly consideration of cases by the courts, including attachment actions, and at the same time it was essential to the Government's program that the results of court proceedings be subject to the same policy considerations from the point of view of freezing control as those arising or recognized through voluntary action of the parties.

"Indeed the Treasury regards the courts as the appropriate place to decide disputed claims and suggested to parties that they adjudicate such claims before applying for a license to permit the transfer of funds. The judgment was then regarded by the Treasury as the equivalent of a voluntary payment order without the creation or transfer of any vested interest, and a license was issued or denied on the same principles of policy as those governing voluntary transfers of blocked assets.

"The Treasury Department did not feel that it could finally pass on an application for a license to transfer blocked assets where the facts were disputed or liability denied. The Treasury felt that it was not practical to pass on the freezing control questions involved in such applications until there was at least a determination of the facts by a court of law. . . ." [22]

---

[20] *Id.* at pp. 5, 7, 9, 11, 13.

[21] *Id.* at p. 14.

[22] *Id.* at pp. 14–15.

Notwithstanding this assertion of complete discretion to grant or withhold approval of ultimate transfers, the Government advised the Court of Appeals that, "So far as foreign funds control is concerned there can be an attachable interest under New York law with respect to the blocked assets. . . ." [23] In language applicable to the case before us now, it said:

"The National Bank of Rumania has property within the jurisdiction. It has not been divested of all its property rights. In fact, its interests today in the blocked assets are perhaps by far the most valuable of all the interests in such assets. This property has not been confiscated by the Government. The National Bank of Rumania is prohibited from exercising powers and privileges which prior to the Executive Order it could exercise. . . . [T]he right of the owner of a blocked account to apply for a license to make payment out of such an account is a most substantial one, and that lawful payment can be made if a license is granted." [24]

And the Government continued:

"An attachment action against a national's blocked account is an attempt to obtain an unlicensed assignment of the national's interest in the blocked account—nothing more and nothing less.

"In this sense, the attachment action might be regarded as a levy upon the nationals contingent power (*i. e.* contingent upon Treasury authorization) to transfer all his interest in the blocked account to A; any judgment in the attachment action resulting in giving A a contingent interest in the account equivalent to what he would have obtained by voluntary assignment.

---

[23] *Id.* at p. 42.
[24] *Id.* at p. 50.

"The value of such an interest is of course problematical. Whether it is worthless or worth full value will depend upon whether the transfer sought is in accordance with the Government's policies in administering freezing control.

"Under this analysis of what the nature of any attachment action against a blocked account must be, in the light of the purposes of freezing control, it is suggested that an attachment action of this nature might well be allowed in the New York courts.[25]

.    .        .        .        .        .

"The Federal Government is anxious to keep to a minimum interference with the normal rights of litigants and the jurisdiction of courts to hear and determine cases, consistent with the most effective prosecution by the Government of total war. Applied to the instant case, this means that the Federal Government must have its hands unfettered in using freezing control, recognizing that it is desirable that private litigants be able to attach some interest with respect to blocked assets in order to clarify their rights and liabilities.

"This has been suggested in this Brief. The Government believes that the interests of private litigants in state courts can be served without interference with the freezing control program. However, the interest of the Government is paramount to the rights of private litigants in this field and should this Court be of the view that under the New York law there cannot be a valid attachment of the limited interests herein suggested, then the Government must reluctantly take the position that in the absence of

---

[25] *Id.* at p. 52.

further authorization under the freezing control, there can be no attachable interest under New York law with respect to blocked assets." [26]

As the Government pointed out in the *Polish Relief* case, the Custodian is charged, among other things, with preserving and distributing blocked assets for the benefit of American creditors. Few claims are not subject to some question, and the Treasury does not pay questionable claims. For those claims to be settled so that they can properly be paid out of blocked assets they must be adjudicated valid by some court of law. Because the debtor rarely is amenable to personal service, any action must be in the nature of a *quasi-in-rem* action preceded by an attachment of property belonging to the debtor within the jurisdiction of the court. If, as the Custodian now contends, the freezing program puts all assets of an alien debtor beyond the reach of an attachment, it is not difficult to see that there can be no adjudications of the validity of American claims and consequently the claims, not being settled, would not be satisfied by the Treasury. The logical end of that course would be complete frustration of a large part of the freezing program. We cannot believe that the President intended the program to reach such a self-generated stalemate.

The New York Court of Appeals took the position urged by the Federal Government. It held that the interest of the debtor, although subject to the licensing contingency, was sufficient as matter of state law to render the levy valid and sufficient as a basis of jurisdiction to decide any issues between the attaching creditor and the foreign debtor. At the same time, it acknowledged that any transfer of the attached funds to satisfy the judgment could only be had if and when the proper license

---

[26] *Id.* at p. 53.

458

had been secured. *Commission for Polish Relief* v. *Banca Nationala a Rumaniei, supra.*

What the New York courts have done here is not distinguishable from what the Government urged in the *Polish Relief* case. Indeed, in that case, the Secretary of the Treasury had expressly denied the application of the petitioner for a license for his attachment. In spite of that, however, the Government urged that the attachment was authorized by settled administrative practice:

> "From the very inception of freezing control, litigants, prior to commencing attachment actions against funds belonging to blocked nationals, have requested the Secretary of the Treasury to license a transfer to the sheriff by attachment. In all those cases, running into the hundreds, the Treasury Department has taken a consistent position. The Treasury Department has authorized the bringing of an attachment action. However, the Treasury Department has not licensed a transfer of the blocked funds to the sheriff prior to judgment." [27]

The foregoing is confirmed in this case by a stipulation that consistent administrative practice treated attachments such as we have here as permissible and valid at the time they were levied.[28]

---

[27] *Id.* at p. 39.

[28] The stipulation of facts states:

. . . . .

"5. From the inception of 'freezing' controls, all litigants who, prior to commencing attachment actions against funds belonging to blocked nationals, had requested the Secretary of the Treasury to license an attachment, or levy, received from the Treasury Department a response of the following nature:

"Under Executive Order No. 8389, as amended, and the Regulations issued thereunder, no attempt is made to limit the bringing of suits in the courts of the United States or of any of the States. However, should you secure a judgment against

The Custodian now asks the federal courts to declare the state court attachments nullities. His request here is not merely that he is entitled to take and administer the fund, but that the attachments are not effective as against the right, title, and interest of the German banks. His request is irreconcilable with the admitted administrative practice and the position urged upon the New York courts in the *Polish Relief* case. He predicates that reversal of position, and so far has been sustained in it, upon the decision of this Court in *Propper* v. *Clark, supra,* to which we accordingly turn.

### III.

The essence of the Custodian's argument that *Propper* v. *Clark* requires invalidation of these attachments, as stated in his brief, is that:

". . . [I]t is little short of absurd to suggest that, while creditors of an enemy national are precluded from reaching his blocked property in the absence of a license where they proceed by the provisional

---

one of the parties referred to in your letter, which is a country covered by the Order, or a national thereof, a license would have to be secured before payment could be made from accounts in banking institutions within the United States in the name of such country or national.

"6. From the inception of 'freezing' controls, the Secretary of the Treasury in administering the 'freezing' control program adopted the position, in response to numerous requests made of him, that the bringing of an action, the issuance of a warrant of attachment therein, and the levy thereunder upon blocked property found within the jurisdiction of the court which issued the warrant were not forbidden but that a license was required to be secured before payment could be made from the blocked account to satisfy any judgment recovered in such action.

"7. . . . A license to institute the action and levy the attachment was in fact not required by the Treasury Department."

remedy of receivership, the opposite result will be permitted where they follow the provisional remedy of attachment." [29]

The answer to this suggested absurdity is that a distinction in New York law, all important here, has eluded the Custodian. The receiver in *Propper* was not a receiver appointed as a provisional remedy but was a special statutory receiver which state law purported to vest with both title and right to possession, which, in case of blocked assets of a foreign corporate debtor, would obviously defeat the scheme of federal controls. As our opinion notes, 337 U. S. at p. 475, Propper's claim, adverse to that of the Custodian, was initiated by a temporary receiver, later made permanent, appointed by a New York state court pursuant to § 977–b of the New York Civil Practice Act, which is entitled, "Receivers to liquidate local assets of foreign corporations." That is a special proceeding added to New York practice by the 1936 Legislature,[30] and provides for appointment of a liquidating receiver of assets within the State owned by a foreign corporation which has been dissolved, liquidated, or nationalized, or which, voluntarily or otherwise, has ceased to do business.[31] Upon application by a creditor of such a corporation, the court appoints a temporary receiver.[32] Title to all such assets vests in him upon appointment,[33] and the statute requires and empowers him to "reduce to his possession any and all assets, credits, choses in action and property" found in the State.[34] If it is established on trial that the corporation has been

---

[29] Brief for Respondent, pp. 16–17.

[30] L. 1936, c. 917.

[31] N. Y. Civ. Prac. Act § 977–b (1).

[32] *Id.* § 977–b (4).

[33] *Id.* § 977–b (19).

[34] *Id.* § 977–b (4).

dissolved or nationalized or that its charter has been annulled or that it has ceased, for any reason, to do business, the receivership is made permanent [35] and notice is given to all creditors to prove their claims.[36] Those allowed, the receiver pays in accordance with statutory priorities.[37] Any surplus is paid to stockholders of the corporation or, in the discretion of the court, to a receiver or liquidator, if any, appointed in the domicile of the corporation or elsewhere.[38]

This special proceeding, which has nothing but name in common with the traditional provisional remedy of receivership,[39] was introduced to protect resident creditors and shareholders against confiscatory decrees by foreign nations. As one court has said:

> "This section became effective on the 8th day of June, 1936, and marks a distinct change in the policy of this State with respect to the disposition of property situated here but which belongs to a foreign corporation that has ceased to do business for any reason, or has been dissolved, liquidated, or nationalized.

---

[35] *Id.* § 977–b (10).

[36] *Id.* § 977–b (11).

[37] *Id.* § 977–b (16).

[38] *Ibid.*

[39] *Id.* §§ 974–977. A receiver appointed as a provisional remedy is not an agent or representative of either party, but holds the property during the litigation pending final judgment. *Weeks* v. *Weeks*, 106 N. Y. 626, 631, 13 N. E. 96, 98 (1887); *People ex rel. Attorney General* v. *Security Life Ins. Co.*, 79 N. Y. 267, 270 (1879). "The receiver acquires no title, but only the right of possession as the officer of the court. The title remains in those in whom it was vested when the appointment was made." *Stokes* v. *Hoffman House*, 167 N. Y. 554, 559–560, 60 N. E. 667, 669 (1901), quoting *Keeney* v. *Home Ins. Co.*, 71 N. Y. 396, 401, 27 Am. Rep. 60, 63 (1877). See also Carmody's Manual of New York Civil Practice (Carr, Finn, Saxe, 1946 ed.) § 609.

"The purpose of this statute, clearly, is to administer the distribution of such assets in this State, irrespective of the scheme of distribution promulgated in any other State inclusive of the domicile of the foreign corporation. . . ." *Oliner* v. *American-Oriental Banking Corp.,* 252 App. Div. 212, 297 N. Y. Supp. 432 (1937) aff'd 277 N. Y. 588, 13 N. E. 2d 783 (1938). See also *Moscow Fire Ins. Co.* v. *Bank of New York & Trust Co.,* 161 Misc. 903, 924, 294 N. Y. Supp. 648, 676 (1937).

Such was the position of the receiver whose claims we rejected in *Propper* v. *Clark.* The courts of New York had themselves recognized that the *Propper* receivership conflicted in principle with federal funds control and had pointed out that in practice it might well defeat the federal policy. It was said, "The principle is well settled that war suspends the right of non-resident alien enemies to prosecute actions in our courts . . . and it cannot be denied that the plaintiff here [Propper], although himself neither an enemy nor an alien nor a non-resident, is seeking to enforce a cause of action which, at least until his appointment, existed, if at all, in favor of a non-resident alien which is also an enemy as the term 'enemy' is defined in the Trading with the Enemy Act. . . . His right to recover must rest upon the rights of such non-resident alien enemy, and while section 977–b of the Civil Practice Act purports to vest a receiver appointed thereunder with title to claims existing in favor of the foreign corporation it also is possible that under that section some proceeds of a recovery herein ultimately may benefit non-resident alien enemies . . . ." *Propper* v. *Buck,* 178 Misc. 76, 78, 33 N. Y. S. 2d 11, 13 (1942).

But, as the Government before that decision so unequivocally urged upon the New York Court of Appeals, attachment proceedings as pursued in these cases have no such consequences. Nothing in these state court pro-

ceedings have purported to frustrate the purposes of the federal freezing program. On the contrary, the effect of the State's action, like that of the federal, was to freeze these funds, to prevent their withdrawal or transfer to use of the German nationals. There is no suggestion that these attachment proceedings could in any manner benefit the enemy. The sole beneficiaries are American citizens whose liens are not derived from the enemy but are adverse to any enemy interests. And, if no federal freeze orders were in existence, these state proceedings would tie up enemy property and reduce the amounts available for enemy disposition. We agree with the Government's assurance to the Court of Appeals in the *Polish Relief* case that these proceedings, in view of the fact that they do not purport to control the Custodian in the exercise of the federal licensing power, or in the power to vest the *res* if he sees fit to do so for administration, are not inconsistent with the freezing program and we think they were not invalidated or considered in *Propper* v. *Clark, supra.* The latter decision is not authority for the judgment asked and obtained by the Custodian here.

## IV. The Vesting Order.

The Custodian in this case has only sought to vest in himself the "right, title, and interest" of the German banks. As we understand it, he acknowledges that if the interests acquired by the attachments are valid as against the German banks he is not, under the Vesting Orders involved, as he has chosen to phrase them, entitled to the attached funds, but he takes the position that no valid rights against the German debtors were acquired by the attachments because prohibited by the freezing program.[40] He has, in short, put himself in the shoes of the German banks. As against the German debtors, the attachments

---

[40] Brief for Respondent, p. 27.

and the judgments they secure are valid under New York law, and cannot be cancelled or annulled under a Vesting Order by which the Custodian takes over only the right, title, and interest of those debtors in the accounts. But, of course, as against the Custodian, exercising the paramount power of the United States, they do not control or limit the federal policy of dealing with alien property and do not prevent a *res* vesting, as sustained in the companion cases, if the Custodian sees fit to take over the entire fund for administration under the Act. In such case, all federal questions as to recognition by the Custodian of the state law lien, or priority of payment, are reserved for decision if and when presented in accordance with the Act.

This result, as we have indicated, in no way impairs federal control over alien property, since the petitioners admit that they cannot secure payment from the attached frozen funds without a license from the Custodian. The case is, therefore, more nearly like *Lyon* v. *Singer*, 339 U. S. 841, 842, where this Court said: "We accept the New York court's determination that under New York law these claims arose from transactions in New York and were entitled to a preference. Since the New York court conditioned enforcement of the claims upon licensing by the Alien Property Custodian, federal control over alien property remains undiminished."

The decision of the court below is

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, concurring.

I join in the opinion of the Court since it places control of the public interest phase of the controversy in the licensing power of the Custodian. Payment of claims

requires a license.[1]    A license, of course, may be refused when payment would accrue directly or indirectly to the benefit of the enemy.    But the policy of the Act is in no way subverted by recognition of a lien which can ripen into a priority only if payment would have no such effect. Denial of the lien could be made only if the Act called for an equality of distribution among claimants, regardless of their innocence or guilt.    I can find nothing in the Act which warrants leveling the good faith lien claimant to the unsecured status of the others.[2]

MR. JUSTICE REED, with whom MR. JUSTICE BURTON joins, concurring in part and dissenting in part.

The Court fails to decide the only question of importance presented by this case.    This question is whether a state attachment, obtained on assets previously blocked under Executive Order No. 8785, gives the attaching creditor any right in those assets that displaces the power of the Government to make such disposition or use of the assets as it may ultimately determine is for the best interest of the Nation and its citizens.    The Court defers all questions as to "recognition by the Custodian of the state law lien, or priority of payment" for later decision.    Under today's decision the Alien Property Custodian vests the account in question without knowing what power he has over its handling or disposition.    Such uncertainty will hamper administration and be an open invitation to the owners of blocked assets to sell their interests in the blocked property, as the Custodian phrases it, "to friendly speculators willing to buy at a discount and to await payment on the ultimate day of unblocking."

---

[1] See § 5 (b) of the Trading With the Enemy Act, 40 Stat. 411, 415, as amended, 54 Stat. 179, 55 Stat. 839, and 8 CFR, c. II, Part 511.

[2] The priority of debt claims contained in § 34 (g), 60 Stat. 925, 928, does not purport to deal with creditors preferred by reason of a lien lawfully acquired in judicial proceedings.

466

The Custodian sought a determination of this troublesome question. His petition in the District Court asked that court to declare that

"respondents Zittman and McCarthy, and McCloskey, as sheriff, obtained no lien or other interest in the 'Reichsbank-Direktorium' or the Deutsche Golddiskontbank accounts, or the funds represented thereby, and that by virtue of Vesting Orders Nos. 7792 and 7870 the petitioner is entitled to the entire balances remaining in the 'Reichsbank-Direktorium' and Deutsche Golddiskontbank accounts on the books of the respondent Chase National Bank, together with all accrued dividends and accumulations."

The decree sustained that request on the authority of *Propper* v. *Clark,* 337 U. S. 472. It is to be noted that the prayer referred to liens or other interests in the accounts and asked that the balances be turned over. The Court is of the view that this is not a simple turn-over request but also seeks a declaration "that no valid rights against the German debtors were acquired by the attachments because prohibited by the freezing program."

While such construction of the petition is possible, I read it to seek a rather different decision. The Custodian's complaint prayed a ruling that the attaching creditors obtained no lien or other interest in the accounts that could determine his action in administering or distributing the fund in accordance with the direction of Congress. This is made clear by the statements excerpted from the Custodian's brief in the margin.[1] It

---

[1] "Petitioners could not thereafter acquire a property interest in the blocked accounts which could prevail against a subsequent vesting by the Custodian." Resp. brief, p. 9.

"Petitioners stress that nothing in the Trading With the Enemy Act or in the freezing regulations prohibits the bringing of suits against enemy nationals in time of war. This is correct. Indeed, the Treasury Department in administering the controls took the position

is substantiated by United States Treasury Department General Ruling No. 12, upon which the Custodian relies.[2]

If the Court has any doubt that anything else was meant by the complaint or decree, the proper course

from the outset that parties were free to seek adjudications of their rights *vis-a-vis* blocked nationals." *Id.* p. 13.

"Respondent does not contend that the attachments were absolutely [*sic*] void or that they were illegal. He agrees that freezing did not purport to prohibit the resort to judicial process. He states simply that transfers in blocked property were proscribed and that the judicial hand was stayed to that extent. Not attachments, but transfers, were controlled. That means that a fixed or absolute lien (as distinguished from 'a potential right or a contingent lien') could not be created without a release of the property from federal control. Since the perfecting of a fixed lien is characteristically subject to numerous contingencies under state law, *e. g.*, the entry of a judgment in plaintiff's favor, it would seem clear that the imposition of a further condition by operation of federal law—the procurement of a license— is not inconsistent with proceedings by way of attachment.

"In effect, then, the Treasury said this:—Blocked property is subject to a federal injunction against transfer. This does not prevent a state court from issuing a writ which also directs the holder of the blocked property to keep it intact. And if the state court, in these circumstances, regards its own process as offering a sufficient promise of control to warrant an exercise of its juridiction [*sic*], there is no objection to its declaring the rights of a suitor as against the owner of the blocked property. But the state court's power to confer a proprietary interest upon the suitor necessarily awaits a lifting of the federal injunction." *Id.* pp. 49–50.

[2] "(d) Any transfer affected by the Order and/or this general ruling and involved in, or arising out of, any action or proceeding in any Court within the United States shall, so far as affected by the Order and/or this general ruling, be valid and enforceable for the purpose of determining for the parties to the action or proceeding the rights and liabilities therein litigated; *Provided, however,* That no attachment, judgment, decree, lien, execution, garnishment, or other judicial process shall confer or create a greater right, power, or privilege with respect to, or interest in, any property in a blocked account than the owner of such property could create or confer by voluntary act prior to the issuance of an appropriate license." 7 Fed. Reg. 2991.

would be to insert in the decree a modifying proviso to the effect that "no lien or other interest, except as between the debtor and creditor, was obtained by the attachment proceedings in the state court." See *Lyon* v. *Singer,* 339 U. S. 841.

In my judgment a valid state attachment, obtained subsequent to the blocking order, is good as between an alien and his creditors. I am also sure that such an attachment has no compelling power upon the Attorney General in his administration of the Trading With the Enemy Act.

*Propper* v. *Clark,* 337 U. S. 472, 482–486, so holds. It was like the present case—a suit by the Alien Property Custodian, after a vesting order, to get possession of the blocked credits. In *Propper* v. *Clark,* as in this case, there was a claim that an interest had passed to a third party, Propper, as permanent receiver by judicial decree entered between the blocking and vesting orders. There is nothing in the group of cases in *Lyon* v. *Singer,* 339 U. S. 841, to weaken the holding in the *Propper* case. The transactions in those later cases likewise took place after a federal blocking order and before a vesting order by the Alien Property Custodian. The New York Court of Appeals had decided that the claimants had preferred claims under New York law against the assets of the alien. We recognized those claims since they were conditioned upon licensing by the Alien Property Custodian, but we distinctly said that the ruling in *Propper* v. *Clark* was not affected because in the *Propper* case "the liquidator claimed title to frozen assets adversely to the Custodian, and sought to deny the Custodian's paramount power to vest the alien property in the United States." Therefore the clear rule of the *Propper* case that the Custodian vests and administers entirely free from effective interference over any rights or title secured by the attachment stands unimpaired. In such a situation it

does not seem to me that there can be any difference between a title acquired by a receiver, subject to the control of the Custodian as licensor, and the lien acquired by the attaching creditor, subject to the same license limitation. The Court's distinction between *Propper* v. *Clark* and this case should have no effect on the result here.

I disagree, too, with the Court's interpretation of the brief filed by the Government in *Commission for Polish Relief* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332, 43 N. E. 2d 345. The case holds only that the attachment is good between the debtor and creditor. It does not hold it good against the Government nor did the Government brief, as I read it, so concede. The brief merely approved suits between litigants to settle those litigants' personal rights, not to get transfers of or liens on frozen assets effective against the Custodian. That is litigation pursuant to General Ruling No. 12 (4), note 2, *supra.* This is clear from the brief, excerpts from which appear below.[3]

---

[3] "Almost from the outset of freezing control the Treasury has had to deal with the problem of litigation, particularly attachment actions, as affecting blocked assets. As will be more fully developed later in this brief, the Treasury did not want to interfere with the orderly consideration of cases by the courts, including attachment actions, and at the same time it was essential to the Government's program that the results of court proceedings be subject to the same policy considerations from the point of view of freezing control as those arising or recognized through voluntary action of the parties.

"Indeed the Treasury regards the courts as the appropriate place to decide disputed claims and suggested to parties that they adjudicate such claims before applying for a license to permit the transfer of funds. The judgment was then regarded by the Treasury as the equivalent of a voluntary payment order without the creation or transfer of any vested interest, and a license was issued or denied on the same principles of policy as those governing voluntary transfers of blocked assets." P. 14.

"The judicial procedure is generally geared to deal only with the rights and liabilities of the parties to the proceeding. The judicial

As the Court does not agree with me on the propriety of making a determination at the present time as above suggested and has left open for future litigation "all federal questions as to recognition by the Custodian of the state law lien, or priority of payment," I forbear from expressing my views at length until this issue is presented.

As indicated above, I think we should modify the judgment entered below by some such insertion as I have heretofore suggested on pp. 467–468, and as so modified affirm that decree.

---

procedure is not the most appropriate field to determine the great political questions of national and international magnitude that will inhere in the ultimate disposition of foreign-owned property in this country and in the determination of the rights of groups of American and foreign creditors. These great problems of national policy can be handled adequately only by the Federal Government. The determination of such national policies should not be forced by judicial decisions in particular cases determining the rights and liabilities of the parties to the proceedings. The questions are political and for the executive, not the judiciary. They are federal, not state. They call for uniform treatment with reference to large national policies, not for disparate local treatment to accord with local policies. Moreover Congress and the executive have set up machinery to deal with the problems, a machinery designed to relate the solution to the whole war effort and the inevitable postwar problems." P. 12.

"Freezing control in protecting blocked assets of overrun countries and their nationals had as a further purpose the desire to make such assets available, at least in part, in the war effort against the Axis. Needless to say, if there can be unlicensed transfers of title to blocked property, the true owners of such blocked property may be prevented from using the property in the war effort. . . ." Pp. 9–10.

" 'Blocked dollars' are still valuable dollars. With a license they are 'free dollars.' More than eighty general licenses and 400,000 special licenses have been issued under the freezing control, authorizing the use of blocked dollars for stated purposes. Moreover, 'hope springs eternal in the human breast.' There are always those who are willing to wait for the day when the war is over with the expectation that the freezing control will be lifted." P. 8.