Efim PERNIKOFF
and
Nathalie Ordioni, also known as
Nathalie Pernikoff, Plaintiffs,
v.
Robert F. KENNEDY, Attorney General of the United States as successor to the Alien Property Custodian
and
Kathryn O'Hay Granahan, Treasurer of of the United States, Defendants.
Civ. A. No. 2073-62.

United States District Court
District of Columbia.
June 28, 1963.

Harold L. Winston, Washington, D. C., for plaintiffs.

Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Anthony L. Mondello, Carl F. Goodman, Attys., Dept. of Justice, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

This is a suit under section 9(a) of the Trading with the Enemy Act, 50 App. U.S.C.A. § 1 et seq., as amended, seeking the recovery of over $19,000 vested since 1951 in the Alien Property Custodian pursuant to Vesting Order No. 18001. In 1953, the plaintiffs filed claims with the Alien Property Custodian for the return of this property, but these claims were disallowed. The present action was begun in 1962, naming as defendants Robert F. Kennedy, Attorney General of the United States acting as successor to the Alien Property Custodi-

an, and William T. Howell, acting Treasurer of the United States. These defendants have now moved for summary judgment upon the grounds that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

For the purposes of this motion, the following must be accepted as facts:

In 1935, Ossip Pernikoff, a Russian citizen by birth who had acquired French citizenship by naturalization on September 7, 1935, organized a German corporation called Palestine & Orient Lloyd G.m.b.H. (hereinafter referred to as "the corporation"). The corporation was solely owned by Ossip Pernikoff, who subscribed to capital stock of the face value of 19,000 reichmarks (although, to comply with the requirements of German law, one Felix Jay subscribed to capital stock of the face value of 1,000 reichmarks). The entire capital of 20,000 reichmarks was paid into the corporation by Ossip Pernikoff, and Felix Jay was a mere "dummy." The corporation was used by Ossip Pernikoff mainly to assist Germans being persecuted by the Nazis in escaping from Germany. The defendants stipulated at the oral argument that Ossip Pernikoff was a Russian Jew who was himself persecuted by the Nazis. He resided in the United States from June, 1940, until January, 1946, and was an officer of the Free French Army under de Gaulle, working with U. S. Naval Intelligence during the war.

In 1938 or 1939, the corporation opened a dollar account at the Incasso Bank N.V. in Amsterdam, Netherlands. This Netherlands bank in turn paid the money into an account maintained by it at the National City Bank of New York.[1] In 1942, Nazi Germany, as part of its persecution of Jews and Jewish-owned corporations, adjudicated the corporation a bankrupt, liquidated its German assets, and dissolved the corporation. By or-

---

1. The date of this transfer from the Netherlands bank to the New York bank does not appear in the papers filed in this case, but both sides have assumed that it took place in 1938 or 1939, or in any event, before any of the disputed freezing orders of the United States Government were promulgated. See discussion infra.

der of the Nazi German Occupation Authorities in the Netherlands, the balance of the corporation's account at the Incasso Bank was transferred to the account of Finanzamt Charlottenburg Berlin. This order, of course, amounted to a paper transfer only, since the actual funds, in dollars, remained on deposit in New York City. The Nazis could not reach these funds because they were "blocked" by order of the U. S. Government. In 1950, the National City Bank filed a report showing that it held over $19,000 in an account in the name of the Incasso Bank, and on June 5, 1951, the Office of Alien Property issued Vesting Order No. 18001, vesting in the Attorney General the entire interest in that account.

Ossip Pernikoff died on August 27, 1952, leaving a will under which he left all his property, including his entire interest in the account deposited (in the name of the Incasso Bank) with the National City Bank of New York, to his children, the plaintiffs herein, who were his sole heirs and next of kin. These plaintiffs were both born in Germany, one in 1926, the other in 1935; both became French citizens, through their father, in 1935; both fled from France on June 8, 1940, when it fell to the Nazis; and both arrived in the United States shortly thereafter, residing in this country until after the war. Both plaintiffs are now citizens and residents of France.

The plaintiffs have alleged, as they must do to recover under section 9(a),[2] that neither has at any time material to this action been an enemy or ally of an

enemy of the United States, nor a national of a designated enemy country. This allegation is not disputed for the purposes of the present motion. It is also conceded for purposes of this motion that if Ossip Pernikoff would be entitled to the return of these funds were he living, then his children, plaintiffs herein, are presently entitled to such return. It is also conceded for purposes of this motion that Ossip Pernikoff himself was not an "enemy or ally of enemy" within the meaning of the Trading with the Enemy Act. The sole dispute concerns whether Ossip Pernikoff had an "interest, right, or title" in the funds which is sufficient for purposes of an action under section 9(a).

There is no doubt that the now defunct Palestine & Orient Lloyd G.m.b.H., Ossip Pernikoff's German corporation which was liquidated and dissolved by the Nazis, was technically an "enemy" within section 2 of the Trading with the Enemy Act, 50 App.U.S.C.A. § 2, which defines an enemy as including "any corporation incorporated within [the territory * * * of any nation with which the United States is at war.]" This conclusion is not disputed by either side.

Plaintiffs, however, advance two theories to support their argument that despite the corporation's enemy status, the interest in the vested funds was owned by Ossip Pernikoff himself until his death, and that plaintiffs herein are therefore entitled to have the funds returned. One theory was advanced in the claim made to the Alien Property Custodian, which claim was a necessary pre-

2. "Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, * * * may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require[.] * * * If * * * the claimant shall have filed the notice as above required * * *, said claimant may institute

a suit in equity in the [United States District Court for the District of Columbia] to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled." § 9(a), Trading with the Enemy Act, 50 App.U.S.C.A. § 9(a).

requisite to bringing suit under section 9(a). There plaintiffs declared that the corporation "was liquidated by the Nazi authorities" in 1942, and that in 1951, at the time of the vesting, Ossip Pernikoff was entitled to the funds then on deposit in New York *"by reason of the liquidation* of P.O.L., in 1942 * * *."* (Emphasis added.) The other theory, advanced for the first time in opposition to the motion of defendants for summary judgment, is contained in an affidavit of Paul Simon, an attorney who is a member of the Bar of the State of New York, who was born and educated in Germany, studied law in Germany and Switzerland, was a judge in the courts of Berlin from 1922 until 1933, when he was dismissed from office by the Nazis, and who has kept current in his study of German law, with particular emphasis upon problems of war-time restitution claims. This attorney, whose qualifications as an expert are not disputed, states as follows:

> "It is true that under German Law, as well as under Common Law, a corporation is a separate legal entity and that title to the corporation's assets is in the corporation rather than in its shareholders. In fact, until Hitler came to power, this theory was adhered to in Germany probably with more force than in the Common Law countries. A change, however, was brought about by the acts of the Nazi Government in connection with its efforts to deprive the Jews in Germany and the occupied countries of their property. It was in the course of this policy that corporations owned and operated by Jews were arbitrarily dissolved and their assets confiscated as 'Jewish' property.

> "After the downfall of the Hitler Regime, the Allied Governments enacted Military Laws in their respective Zones of Occupation, aiming at the restitution of Jewish property, confiscated by the Nazis, to its rightful owners. In this connection, the question arose who was entitled to

such property which prior to its confiscation was owned by a corporation which was dissolved by the Nazi Authorities as 'Jewish owned and operated'. If the doctrine of 'separate legal entity' would have been applied by the German and International Courts, entrusted with the enforcement and interpretation of the Allied Restitution Laws, it would have been necessary to 'revive' such dissolved corporations, as far as such 'revival' was possible under German Law, and to appoint a liquidator of such 'revived' corporation for the purpose of collecting the assets of such corporation and to distribute the proceeds of such collection among the shareholders of the corporation. If, however, the shareholders were regarded as the true owners, they would have been entitled to the restitution of the confiscated assets rather than the defunct corporation.

> "This problem came before the Supreme Restitution Court in Berlin, an international tribunal created by the Allied Governments for West Berlin, composed of a Swedish Judge as Presiding Judge, and three Allied and three German Judges, as Associated Judges, in the matter of ARNDT vs. NORD-DEUTSCHE SALINEN–VEREINIGUNG G.m.b. H. The decision in this matter, which was rendered on May 17, 1956, and published in Volume V of the Official Collection of the decisions of the said Court, deals with the above stated problem on pages 424 to 427. The Court, relying on a statement by the Court of Restitution Appeals for the American Zone of Occupation (Opinion No. 476, Case No. 1080, dated August 1, 1955) reached the conclusion that, in the case of a one-man corporation, the veil of corporate entity had to be pierced and that the assets which were put into the corporation by the sole shareholder were his property rather than the property of the corporation used by him as a

cloak in his business transactions; that title to such assets had never ceased to be in the sole shareholder and that they could be recovered by him; and that there was no need to revive the corporation and to appoint a liquidator in order to return the property to its rightful owner.

"As appears from a recent decision of the Supreme Restitution Court for the former British Zone of Occupation, dated November 29, 1961, published in 'Rechtsprechung zum Wiedergutmachungsrecht' 1962, page 161, Nr. 7, the leading German Law Review dealing with the Law of Restitution and Indemnification, the concept of 'piercing the veil of corporate entity' has been adopted by the German Law as a general proposition, not only confined to questions of the Law of Restitution.

\*　\*　\*　\*　\*　\*

"From the foregoing, I reach the conclusion that under German Law, as it stands now, Ossip Pernikoff as the sole shareholder of Palestine and Orient Lloyd, G.m.b.H. *was and always has been the owner* of the funds deposited with the Incassobank in the name of his corporation and vested by the Alien Property Custodian, and that \* \* \* *he has been the owner of the said funds 'ab initio'.*" (Emphasis added.)

The only difference between plaintiffs' two theories is that in one, Ossip Pernikoff's direct interest dates from 1942, when the corporation was liquidated, and in the other, he is considered the owner from the time of the original deposit, in 1938 or 1939. There is no real difference between the two theories, however, since both are clearly designed to achieve the same result by the use of different words: to provide that funds which belonged in name to German corporations but never reached Nazi hands be returned to non-enemy individuals who were continuously the sole shareholders of such corporations. If this result is consistent with the Trading with the Enemy Act, on either of the above theories or on some other theory, then the motion of defendants for summary judgment must be denied.

■ As to the first theory, defendants contend that if the Nazi liquidation of the corporation transferred the ownership of the funds to Ossip Pernikoff, then such transfer was ineffective under the terms of Executive Order No. 8389, the so-called "freezing order" of April 10, 1940, set forth following 12 U.S.C.A. § 95a, which prohibited "transactions" which involved property in which any of certain designated foreign countries (including both Germany and the Netherlands at the time the corporation was liquidated), or any national thereof, had, at any time on or since the effective date of the order, "any interest of any nature whatsoever, direct or indirect. \* \* \*." The Secretary of the Treasury was given authority to license particular transactions, but in the absence of such license—as was obviously the case so far as the 1942 liquidation is concerned—any such transaction was prohibited. The "transactions" prohibited by the order included "[a]ll transfers of credit between any banking institutions" in the United States and abroad, "[a]ll transfers \* \* \* of any evidences of indebtedness or evidences of ownership of property," and "[a]ny transaction for the purpose of [or] which [had] the effect of evading or avoiding the foregoing prohibitions." The language of this order has been broadly construed to

"[immobilize] the assets covered by its terms so that title to them might not shift from person to person, except by license, until the Government could determine whether those assets were needed for prosecution of the threatened war or to compensate our citizens or ourselves for the damages done by the governments of the nationals affected." Propper v. Clark, 337 U.S. 472, 484, 69 S.Ct. 1333, 1340, 93 L.Ed. 1480 (1949).

The purpose of the freezing program, as thus broadly construed, has been well-stated as follows:

"The freezing program, by subjecting to licensing and consequent strict scrutiny transactions affecting property in the United States in which foreign countries (allied and neutral as well as enemy) or their nationals had an interest, not only prevented the Axis from using its own property in the United States as a means of obtaining credit and foreign exchange but, more important, seriously interfered with its plans for the looting of conquered countries. * * The imposition of 'occupation costs' or the simple pointing of a gun could secure the transfer of interests in American property to the Axis; 'evidences of ownership' so obtained could easily have been exchanged in neutral countries for 'hard money.' As it was, few neutrals cared to speculate in evidences of ownership which American law declared null and void." Bishop, Judicial Construction of the Trading with the Enemy Act, 62 Harv.L.Rev. 721 (1949).

The freezing program was endorsed by Congress in a Joint Resolution of May 7, 1940, and was extended when Congress in 1941 amended Section 5(b) of the Trading with the Enemy Act to give the President explicit and broad powers to "nullify, void, prevent or prohibit any * * * transfer, * * * or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest * * *." The Department of the Treasury implemented the licensing program further in its General Ruling No. 12, 31 C.F.R.Cum.Supp. (1943 ed.) 8849–50 (April 21, 1942), which defined "transfer" as:

"any actual or purported act or transaction, whether or not evidenced by writing, and whether or not done or performed within the United States, the purpose, intent, or effect of which

is to create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property and without limitation upon the foregoing shall include the making, execution, or delivery of any assignment, power, conveyance, check, declaration, deed, deed of trust, power of attorney, power of appointment, bill of sale, mortgage, receipt, agreement, contract, certificate, gift, sale, affidavit, or statement; the appointment of any agent, trustee, or other fiduciary; the creation or transfer of any lien; the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order, or the service of any garnishment; the acquisition of any interest of any nature whatsoever by reason of a judgment or decree of any foreign country; the fulfillment of any condition, or the exercise of any power of appointment, power of attorney, or other power: *Provided, however*, That the term 'transfer' shall not be deemed to include transfers by operation of law."

There is, of course, no question that the purported Nazi "transfer" of the credit balance in the Incasso Bank to the Finanzamt Charlottenburg Berlin was precisely such a transaction as the freezing program was designed to render completely ineffective, and if Ossip Pernikoff were claiming ownership via such transfer, he would be barred, since the transfer was obviously never licensed. The defendants argue as if this were the plaintiffs' theory. But when the plaintiffs say that Ossip Pernikoff was entitled to the funds in 1951 (at the time the funds were vested by the Alien Property Custodian) *"by reason of the liquidation"* of the corporation in 1942, plaintiffs are asserting something different: namely, that because the corporation was declared by the Nazis no longer to exist, and because the freezing program was effective to keep the funds from Nazi hands, and because

Ossip Pernikoff had a rightful and equitable claim to the funds, that therefore these plaintiffs are entitled to recover.

This Court can find no language, either in Executive Order 8389, supra, or in General Ruling No. 12, supra, or in the Trading with the Enemy Act, or in any case cited by the defendants, to require the rejection of plaintiffs' theory. Indeed, the Government itself has gone on record as indicating that one of the purposes of General Ruling No. 12 was: "Protecting property of persons in occupied countries." See Zittman v. McGrath, 341 U.S. 446, 453, 71 S.Ct. 832, 837, 95 L. Ed. 1096 (1951). Such "protection" would be illusory indeed if, after the freezing program has succeeded in keeping the funds from Nazi hands, those funds are not returned to the heirs of the person for whom the protection was designed in the first place. In reality, there was no "transaction" or "transfer" which would subject Ossip Pernikoff's claim of title to the licensing requirements of the freezing order. The only "transfer" or "transaction" was the ineffective Nazi transfer, which was solely a paper transaction through which plaintiffs do not derive title. Plaintiffs' title is derived from the fact that the corporation simply ceased to exist. It is important to note, as well, that there was no speculation in Pernikoff's interest, and title to that interest did not "shift from person to person," Propper v. Clark, 337 U.S. at 484, 69 S.Ct. at 1340. In fact, such title never shifted at all, and in law, such title did not shift except so far as this Court now holds that the dissolution and liquidation of the corporation operated, as a matter of United States law, to transfer the title to Ossip Pernikoff. This Court, therefore, can reach no other conclusion except that, in equity and fairness and within the terms of the Trading with the Enemy Act, the plaintiffs here are not barred by any lack of a license under the freezing program. And, it should be remembered, Congress has specified that suits under section 9(a) are suits "in equity."

■ As to plaintiffs' second theory—that under German law as put forth in the affidavit of Mr. Simon, Ossip Pernikoff is considered to have been the true owner of the funds from the moment of their deposit—the defendants contend that the case upon which Mr. Simon bases his opinion was a restitution case, and that general German law, as distinct from special restitution law, is to the contrary. Mr. Simon, however, stated that the principles he relied on had become general German law, and defendants have offered no counter affidavit. In any event, the policy behind the present German law, even if it is the law of restitution, seems completely applicable to the instant case. Therefore, to the extent that foreign law is relevant to this case, plaintiffs have raised a material issue of fact (since foreign law must generally be proved as a fact).[3]

The motion of defendants for summary judgment will therefore be denied, both because there is a material issue of fact which is in dispute, and because the plaintiffs have alleged sufficient facts to establish Ossip Pernikoff's "interest, right, or title" to the funds within the meaning of section 9(a) of the Trading with the Enemy Act.

3. In any event, this Court is not clear that foreign law would apply to determine Ossip Pernikoff's title to these funds, since it is a statute of the United States which is being interpreted. See Propper v. Clark, 337 U.S. 472, 484–485, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949) (applying federal rather than state law); McGrath v. Zander, 85 U.S.App.D.C. 334, 177 F.2d 649 (1949) (applying federal 338, 177 F.2d 649 (1949) (applying federal law in harmony with German law). If the facts at trial are proved to be as they are assumed for the purposes of this motion, this Court would hold plaintiffs entitled to the funds under the Trading with the Enemy Act, with German law supporting but not controlling such result. The two different theories advanced by plaintiffs would therefore both support plaintiffs' position.